[Civ. No. 26040. Fourth Dist., Div. One. Jan. 24, 1983.]

FULLERTON UNION HIGH SCHOOL DISTRICT et al.,
Plaintiffs and Appellants, v.
WILSON RILES, as Superintendent, etc., et al., Defendants
and Respondents.

## COUNSEL

Gibson, Dunn & Crutcher, David A. Cathcart, Dennis A. Gladwell and Susan Erburu Reardon for Plaintiffs and Appellants.

George Deukmejian, Attorney General, Thomas E. Warriner, Assistant Attorney General, Anne S. Pressman, Louis Verdugo, Jr., and Richard J. Magasin, Deputy Attorneys General, for Defendants and Respondents.

## OPINION

**STANIFORTH, J.**—Plaintiff Fullerton Union High School District (Fullerton) seeks to compel repayment of over $3.2 million taken by the California State Department of Education (Department) from Fullerton[1] by the process of an unconsented-to deduction of this sum from "scheduled apportionments" (payment of state funds) due Fullerton from the Department. The Department's withholding action additionally reduced Fullerton's "base revenue limit" by $786,695 for the fiscal year 1979-1980 and each succeeding school year with consequent profound and negative effects on Fullerton's vocational education program instituted in reliance upon availability of these funds. After an evidentiary hearing, the trial court refused to apply estoppel principles to bar the Department's recapture of funds, found no denial of due process or equal protection in the unilateral recapturing process and no duty to return money deducted from Fullerton's apportionment. Fullerton appeals.

[1]Four other school districts, Rowland, Compton, Orange and Placenta had, along with Fullerton, filed for and received funds pursuant to the Department's position taken in 1977-1978 for total payments including those to Fullerton of $6.4 million, all of which were "recaptured" after 1979.

## FACTS

Fullerton is a duly organized local educational agency. It receives the bulk of its operating revenue from state funds apportioned according to the average daily attendance (ADA) of the students within the district. The Local Assistance Bureau of the Department apportions ADA funds to local school districts throughout the State of California.

Beofore 1967, under Education Code section 11051, no California high school district could be credited with more than one average day of attendance for each day a student attended school. In 1967 section 11051 was amended and renumbered section 46140. This amendment provided: "No pupil in a high school, *other than a pupil in a vocational education program occupationally organized and conducted under federal approval, evening high school, continuing high school, or continuation education class,* shall be credited with more than one day of attendance in any calendar day and nothing in this article shall be construed to the contrary." (Italics added.)

Since the 1967 amendment, the Department has construed the amended section as follows: "*pupils in a vocational education program occupationally organized and conducted under federal approval*" (italics added) *means that such extra ADA credits must be limited to those high school students attending vocational education classes in "Regional Occupational Centers" (ROCs) or "Regional Occupational Programs" (ROPs).*

In the latter part of 1975, the Department discovered the additional ADA credit had, since 1971, been claimed by the Garden Grove School District (Garden Grove) and paid by the Department to that district *although the vocational students were not attending ROP or ROC programs.* Because of the method of reporting ADA, the Department did not detect from its examination of Garden Grove's attendance records that Garden Grove had successfully claimed the additional ADA funding under section 46140.

In 1976, the Local Assistance Bureau requested the opinion of the Department's legal office as to its authority, under section 46140 to pay additional ADA credits for students participating in federally approved vocational education programs *which were not part of ROCs or ROPs.* On July 16, 1976, the *legal office issued its opinion which concluded the 1967 amendment allowed school districts to claim more than one apportionment day per day of attendance for "pupils in a vocational education program occupationally organized and conducted under federal approval," as defined in section 46140, even though such program was not a ROC or ROP.*[2] The Department took no action

---

[2]This document is set forth in full in appendix A.

to publicize the opinion, its reasoning or conclusions and did not follow it, except in the case of Garden Grove. Instead, the Department continued to publicly maintain its position section 46140 did not permit additional ADA credits for programs which were not ROCs or ROPs.

In November 1976, Fullerton became aware section 46140 might allow more than one apportionment day of credit for attendance by high school students in vocational education classes which were federally approved and supported but did not happen to be conducted in a ROC or ROP. Fullerton immediately began gathering detailed data for the 1976-1977 school year in order to claim the additional ADA credits. As part of the enormous compilation of data, each student's class records had to be manually reviewed to determine whether the pupil was taking enough courses, in addition to the vocational education program, to meet the minimum day standard required for federal funding. Fullerton hired a full-time and a part-time person to assist in the data collection.

Fullerton was busily engaged gathering this data when on December 1, 1976, the Department issued the following letter:

"To: County Superintendents, District Superintendents of Secondary School Districts, Superintendents and/or Directors of Regional Occupational Centers and Programs, and Directors of Vocational Education for Secondary School Districts and County Offices of Education

"FROM: Jacque T. Ross, Associate Superintendent and Chief, Division of Administrative Services

SUBJECT: INTERPRETATION OF EDUCATION CODE SECTION 11051

"For several months now the Department of Education has received numerous requests asking what Section 11051 of the Education Code means in relation to a high school district's Vocational Education program, and the generating of a.d.a. for apportionment purposes for students enrolled in such programs.

"The Department's Administrative Services and Secondary Education Divisions both have advised that *they do not believe the section was meant to allow districts to gain extra a.d.a.* from regular high school students enrolled in a federally approved vocational education courses of the district for part of the school day. However, some districts are claiming extra a.d.a. on the basis that this section gives them the legal right to do so. *Therefore, this is to notify those high school districts who may already be claiming this additional attendance, or for those districts who may be gearing up to report this additional attendance, that the Department of Education is now working with the Legislature*

*for corrective legislation which will remove this authorization to report and claim this additional a.d.a.*

"If you should need additional information, please contact Jack Liebermann (Bureau of Management Services) at 916/322-2470 or me (916/322-3024).

"/s/Jacque T. Ross

"JTR:bc" (Italics added.)

The vigorous activities begun by Fullerton were suspended because of the unmistakeably discouraging words of Ross' letter. Fullerton's evidence is uncontroverted: Had it not stopped its data gathering, Fullerton would have filed a timely (not an amended) application. The Department concedes had such application been filed the state funding laws then in force would have entitled Fullerton to receive and retain the sums it here seeks to recover.

On April 14, 1977, Assembly Bill No. 1641 was introduced and enacted (eff. Aug. 1, 1977). This statute (amended § 46140) limited specifically the availability of more than one apportionment day credit to high school students attending federally funded and supported vocational education programs conducted in ROCs and ROPs.[3] At the same legislative session section 46140.5 was added to the Education Code.[4] With this authorization, the Department has continued to this day to make extra ADA payments to Garden Grove.

---

[3]Concerning the availability of extra ADAs under the existing law before amendment, the Digest, from the Assembly Office of Research, stated: "Under existing law, school district revenues derived from the average daily attendance (ADA) of adults must be spent for adult education purposes. Districts may claim more than one ADA in one calendar day for regular high school students enrolled in federally approved vocational education programs. [¶] This bill removes authorization to claim more than one ADA for these students."

And the Enrolled Bill Report, from the Department of Finance, Analysis, stated: "2.a. Current law allows a student to generate more than one day of attendance in high school if he is enrolled in later afternoon or Saturday vocational education classes. [¶] b. This bill eliminates the capability of generating additional attendance days, i.e., 'a second ADA', in certain vocational courses. To avoid penalizing districts that have utilized this option in the past, this bill provides that districts may request an increase of their revenue limit corresponding to the amount of money that had been generated by the special attendance allowed for vocational education. (Apparently, only one school district in the State—Garden Grove Unified—has utilized this additional ADA option for vocational education.)"

[4]Section 46140 of the Education Code was amended to read: "No pupil in a high school, other than a pupil enrolled in a regional occupational center or program, evening high school, continuation high school, or continuation education class, shall be credited with more than one day of attendance in any calendar day and nothing in this article shall be construed to the contrary."

Section 46140.5 was added to read: "Any school district which was credited with attendance of pupils pursuant to Section 46140 under a vocational education program occupationally organized and conducted under federal approval in 1976-77, other than a regional occupational program or regional occupational center, may request the county superintendent of schools to increase the district base revenue limit for fiscal year 1977-78 and fiscal years thereafter by the amount of revenue received on account of such vocational education attendance in 1976-77. The county superintendent, upon verification of such amounts, shall adjust the district's base revenue limit."

In January 1978, Fullerton submitted an *amended* 1976-1977 attendance report. This amendment was specifically authorized by section 41341, which provides that *such reports may be amended within three years of their filing.* Fullerton sought by its amended report approximately $1.42 million for ADA credits for the 1976-1977 school year for students enrolled in federally approved and supported vocational education classes *which were not ROPs or ROCs.* Fullerton's claim was also based upon the new Education Code section 46140.5.

On September 20, 1978, the Department's legal office prepared a second opinion, interpreting section 46140, as amended in 1977, section 46140.5 and section 41341. *The Department's legal advisers concluded under section 41341 school districts could file amended reports and claim the additional ADA credit as sought by Fullerton in its January 1978 amended report.*

On September 28, 1978, Fullerton submitted a second and further attendance report with the Local Assistance Bureau, covering the 1975-1976 school year. Fullerton sought approximately $1,815,000 for additional ADA credits for students enrolled in federally approved and supported vocational education classes which were not ROCs or ROPs. Such claims were based upon the same authority as set forth in their January 1978 report for the 1976-1977 school year.

On June 8, 1979, in conformance with the legal opinion of September 1978, the Local Assistance Bureau notified Fullerton that pursuant to Fullerton's amended attendance reports, corrective apportionments for the 1975-1976 and 1976-1977 school years would be made, adding $1,816,515 for the 1975-1976 year and $1,423,539 for the 1976-1977 year. However, the Department also stated that pending legislation, if passed, would "clarify" Education Code sections 46140 and 46140.5 on which Fullerton had relied in claiming and receiving additional ADA apportionment payments for the 1975-1976 and 1976-1977 school years, and that if passed such legislation would cause a "correction" to be made to recover the sums granted.

The payments on account of additional ADA credits were made by the state Controller to Fullerton on June 28, 1979. The legislation purporting to "clarify" and "correct" Education Code sections 46140 and 46140.5 was enacted in September 1979.

On February 8, 1980, under color of authority claimed through the September 1979 amendment to section 46140.5—over three years after its legal office concluded Fullerton and other school districts similarly situated were entitled to

vocational education funding—the Department initiated unilateral action to take back from Fullerton the funds paid on June 28, 1979. These funds were reclaimed by successive deductions from Fullerton's ADA apportionments for February through May 1980. The Department took no action to recapture the additional payments made to Garden Grove or to halt further payments to Garden Grove.

Fullerton's response to this selective recapture of $3,237,057 from their ADA payments was to seek a writ of mandate and other judicial relief challenging the Department's action.

## The Trial Court Decision

After a contested hearing, the trial court made the following pertinent findings: (1) The 1967 amendment to section 11051 expressly provided that more than one day of ADA payments could be received for each student attending vocational education programs occupationally organized and conducted under federal approval. (2) The December 1976 letter sent by the Department discouraged Fullerton and other school districts from filing claims for additional ADA payments based on federally approved vocational education programs, even though such funds had for years been received by Garden Grove. (3) The letter sent by the Department did in fact result in Fullerton suspending its activities in gathering information and data to support a timely application for the state vocational education funding assistance. (4) The Department was explicitly advised by its own legal counsel on July 16, 1976, that section 46140 allowed school districts to claim additional or special education funding assistance for high school vocational education programs of the type being administered by both Garden Grove and Fullerton.

In denying the writ of mandate, the trial court reached these conclusions: (a) The conduct of the Department discouraging Fullerton and other school districts from filing claims for the additional funding payments was reasonable under the circumstances. (b) Fullerton's delay in submitting its claim for additional monies for the 1976-1977 school year until September 1977 was unreasonable. (c) The Department was not obliged to disseminate and was not bound by the July 16, 1976, legal opinion issued by its legal office. (d) Singling out Garden Grove and retroactively disqualifying Fullerton from amending its prior funding applications to include vocational education assistance claims did not deprive Fullerton of due process of law or equal protection of the laws. (e) The Department was not estopped by its conduct from rejecting Fullerton's amended claims. And finally, (f) the Department had no duty to return the funds recovered from Fullerton.

DISCUSSION

I

· Fullerton contends the Department should be estopped from denying its claim for return of those additional funds for the 1975-1976 and 1976-1977 fiscal years.

■ The doctrine of equitable estoppel is bottomed on concepts of equity and fair dealing. (See *Strong* v. *County of Santa Cruz* (1975) 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264].) The doctrine may be applied against a governmental body where justice and right require it. (*Driscoll* v. *City of Los Angeles* (1967) 67 Cal.2d 297, 306 [61 Cal.Rptr. 661, 431 P.2d 245].) The doctrine, however, is not applicable if it would result in the nullification of a strong rule of public policy adopted for public benefit. (*Strong* v. *County of Santa Cruz, supra,* at p. 725.) If the doctrine is applicable, the governmental unit may not deny the existence of a state of facts if it intentionally leads another to believe a particular circumstance to be true and to rely upon such belief to its detriment.

This doctrine has been applied against a governmental entity in a variety of factual situations. *Driscoll* v. *City of Los Angeles,* 67 Cal.2d 297, is the seminal case. The California Supreme Court established the necessary elements to make a successful claim of equitable estoppel against a public agency: "Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Driscoll,* at p. 305.)

*Driscoll* was an action filed by widows of police and fire department members for a declaration of past and future pension rights and benefits. The city argued the causes of action were barred by the statute of limitation because the plaintiffs failed to make timely claims for benefits. The trial court in *Driscoll* found, inter alia, the governmental agency had in good faith given advice as to statutory regulations for pension entitlements but that advice later proved inaccurate.

The Supreme Court held estoppel appropriate because of the nature of the claimant's right and the impact of the advice upon the recipients: "The claims which plaintiffs assert are, indeed, fundamental in nature. . . . [A] widow's right to a continuing pension upon the death of her retired husband . . . must be equated . . . with the right to engage in one's chosen profession. . . . Hence,

the City bore a heavier and more stringent duty to desist from conduct or advice that may have induced plaintiffs not to pursue their remedies . . . ." (*Driscoll,* at p. 310.)

*Driscoll* relied on *Lerner* v. *Los Angeles City Board of Education* (1963) 59 Cal.2d 382 [29 Cal.Rptr. 657, 380 P.2d 97], where the state Board of Education, acting pursuant to a retroactively applied statute, revoked the plaintiff's teaching credential. As a result, Lerner was discharged from his employment. Four years later the retroactive application of the statute was held invalid by another court. Although plaintiff's credential was restored, the city refused to reinstate him. The court held the three-year statute of limitations was not a bar to the commencement of Lerner's action because when he first petitioned the board to reinstate him, the board advised Lerner it had no jurisdiction or authority to restore his credential and no school district could employ him. The court found this advice induced Lerner to do nothing. The state board was thereby estopped to assert bar by the statute. (*Id.,* at pp. 396-397.)

In *City of Long Beach* v. *Mansell* (1970) 3 Cal.3d 462 [91 Cal.Rptr. 23, 476 P.2d 423], the California Supreme Court, relying on *Driscoll,* applied the doctrine of equitable estoppel to a governmental entity to permit consummation of the remaining portions of an agreement settling certain boundary questions. The issue in *Mansell* was whether city officials would be ordered by the court to transfer title in certain tidelands to residents who had lived there for several decades. The Long Beach officials asserted such title transfers were contrary to law. The Supreme Court said: "[T]he proper rule governing equitable estoppel against the government is the following: The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*Id.,* at pp. 496-497.)

The *Mansell* decision raises this cautionary signal: The doctrine is inapplicable if it would result in the nullification of a strong rule of policy adopted for the benefit of the public. The Supreme Court, however, could find no public policy barrier to applying the estoppel doctrine. (*Id.,* at p. 493.)

The Supreme Court balanced the policy interests at issue and estopped the city officials, saying: "[M]anifest injustice would result if the very governmental entities whose conduct has induced this reliance were permitted at this late date to assert a successful claim of paramount title and thereby wrest the subject property from the homeowners who have settled upon it." (*Id.,* at p. 499.)

In *Fredrichsen* v. *City of Lakewood* (1971) 6 Cal.3d 353 [99 Cal.Rptr. 13, 491 P.2d 805], Fredrichsen failed to file a timely claim against the city because the city supplied her with inaccurate information. Again adverting to *Driscoll*, the Supreme Court reasoned the city was estopped to deny plaintiff's claim because plaintiff was deterred from filing the claim by the city's own misinformation. "The city cannot frustrate plaintiff's attempt to comply with a statute enacted for its benefit and then assert noncompliance as a defense." (*Id.*, at p. 360.)

In reaching its decision, *Fredrichsen* reviewed the factors enunciated in *Driscoll* to determine whether the government's action was sufficiently culpable to warrant estoppel. Among these factors are: "[W]hether . . . the inaccurate advice or information is negligently ascertained, whether or to what extent the agency is certain of the information it dispenses, whether the agency purports to advise and direct or merely to inform and respond to inquiries, whether the agency acts in bad faith, whether the claimant is one who purports to have no knowledge or training which would aid him in determining his rights and the public agency purports to be informed and knowledgeable, whether the right of which the claimant is being deprived is significant, and whether a confidential relationship exists between the claimant and the public entity." (*Fredrichsen,* at p. 358.) (See also *State of California* v. *Haslett Co.* (1975) 45 Cal.App.3d 252, 256-257 [119 Cal.Rptr. 78].)

## II

The Department contends the foregoing rules have no application to the factual matrix of this case. The Department argues: It did not know nor should it have known additional vocational education funding was available under 46140; Fullerton knew such funding was available since November 1976; the Department did not intend that Fullerton not file a claim; Fullerton did not have a right to believe the Department was discouraging them from filing a claim. The evidence in this record is not reconcilable with the Department's most critical factual contentions.[5]

The evidence is uncontroverted: The Department knew as early as November 1975 the Garden Grove district had been receiving additional ADA funds. Any doubts the Department harbored as to whether such claims were lawful should have been dispelled by the legal opinion (rendered in July 1976) which expressly concluded school districts could claim more money under 46140 for educational programs not affiliated with ROCs or ROPs.

---

[5]Nor do the judicial decisions relied on by the Department apply to the factual matrix here. Thus, *Merco Constr. Engineers, Inc.* v. *Los Angeles Unified Sch. Dist.* (1969) 274 Cal.App.2d 154 [79 Cal.Rptr. 23], is not controlling as the standard for estoppel against a governmental entity. In *Merco,* the court enumerated four exceptional circumstances where estoppel is not available against the government. None of the listed circumstances are factually present here.

Secondly, rather than notify school districts these funds were available, the Department, in December 1976, issued the Ross letter. This letter was totally inconsistent with the position expressed by the legal office. *The letter was prepared and distributed by the Department in direct response to inquiries by school districts about the status of section 11051* (46140) as a source of extra ADA funds. With no acknowledgment or hint there was a different interpretation of the code within the Department, the letter in no uncertain terms informed school districts they would not be able to collect the additional monies. Predictably, the letter discouraged school districts, Fullerton among them, from instituting or continuing the laborious data collection process requisite to filing a timely claim for funds.

Third, in November 1976, Jerry Miltenberger, coordinator for vocational education at Fullerton, learned from a Garden Grove official additional funding may be available under section 11051. Another official confirmed the fact Garden Grove was receiving payments from the Department. Based upon this information, Miltenberger immediately began data collection and continued until he received Ross' letter. After receipt of the Ross letter, Miltenberger contacted Jerry Levendowski, an official in the state Department of Vocational Education whom he had previously consulted for opinions and was told not to file the report because Fullerton was not going to "be able to collect it."

Fourth, Miltenberger then conferred with Fullerton's Assistant Superintendent Robert French. It was decided in light of the pessimistic outlook for obtaining the additional ADA funds, it would be more fruitful to commit the district's limited resources elsewhere. For these reasons Fullerton suspended its efforts to collect substantiating documents from January through May 1977.

Fullerton received even more discouragement. While attending a conference sponsored by the Department in the spring of 1977, Miltenberger asked a Department official whether 11051 funds would be available. The response again was negative. Finally, Fullerton was ignorant of the Wolfertz legal opinion until spring 1977 when Fullerton officials saw only a partial copy.

The Department argues it was not under any obligation to provide school districts with information concerning the availability of additional vocational education funds. Uncontradicted evidence in the record compels a contrary conclusion. Stephen Parodi, chief of the Local Assistance Bureau, testified the Department had a widely known mission to advise school districts of their rights to funds. The express function of the Department was to gather and publicize this information. Parodi said the Department was responsible for advising California school districts of the rules, methods, and procedures for reporting attendance, making budgets and collecting money and the Department conducted workshops and seminars for this express purpose. Parodi said the Department intends school districts to rely upon this information.

The Department published an official manual, *Attendance and Enrollment Accounting and Reporting in California Public Schools* which governed applications for ADA funding credits. This manual was designed to assist the school districts in the accounting of student attendance.[6] *In its 1977 edition, the manual specifically restricted special ADA credits for vocational education programs to ROPs and ROCs and provided a special form for calculating the extra ADA credits that expressly restricted such credits to enrollments in ROPs and ROCs.*

Nowhere in the legislative history of 46140—before its 1977 amendment—is there any evidence the *Legislature* intended such a narrow restriction on funding of federally approved vocational education programs. (*Ante,* fn. 4.) Parodi's explanation for the Department's interpretation of 46140 offers no clue as to how the policy arose.[7]

Further (when notified that the amended application would be approved) in anticipation of additional ADA funding, Fullerton committed valuable resources to improving and expanding its vocational education program: 25 teachers went through the necessary qualifications to obtain vocational credentials. Their course work resulted in an expansion of trade and industrial programs for Fullerton for the 1976-1977 and 1977-1978 school years. During the 1976-1977 school year, Fullerton had courses in construction, graphic arts occupations, plastics occupations, body and fender work and combination welding. During the 1976-1977 school years, courses were added in industrial crafts, drafting, electricity and electronics, photography, metals, plastics, auto mechanics, woods, and other industrial arts, as well as additional courses in construction and graphic arts. During the 1977-1978 school year courses were added in auto mechanics, other automotive work, photography occupations, drafting occupations, electronics occupations, machine shop occupations and woodworking occupations.

The expense of administering the expanded courses and maintaining/rehabilitating the existing program could not be covered by Fullerton's regularly scheduled apportionment. The Department's recapture of $3.2 million resulted in a severe and dramatic loss to the instructional program. That Fullerton relied to its detriment on the Department's representations on several critical matters is not challenged.

---

[6] In the manual, Wilson Riles declares: "This manual is designed to help you, the school administrator and teacher, maintain a sound and consistent system for the accounting of student attendance."

[7] "Q. Can you tell me where you obtained what you've characterized as the intent of this code section?

"A. I didn't obtain it from anyplace, just in reading, how it reads and knowing the situation as it existed at that particular time relative to the ROP programs expanding, and I think clarifying for them that they can earn more ADA by attending a ROP program."

The foregoing uncontradicted facts, when coupled with the controlling legal principles, compel the conclusion Fullerton established an appropriate case for application of equitable estoppel.

■ The proof of existence of an estoppel is in the first instance a question of fact. (See *General Motors Accept. Corp.* v. *Gandy* (1927) 200 Cal. 284, 295 [253 P. 137]; *Pacific Gas & Elec. Co.* v. *Hacienda Mobile Home Park* (1975) 45 Cal.App.3d 519, 531 [119 Cal.Rptr. 559]; *Calif. Sch. Employees Assn.* v. *Jefferson Elementary Sch. Dist.* (1975) 45 Cal.App.3d 683, 693 [119 Cal.Rptr. 668]; *Landberg* v. *Landberg* (1972) 24 Cal.App.3d 742, 759 [101 Cal.Rptr. 335].) Ordinarily the trial court's determination is binding on appeal unless the contrary conclusion is the only reasonable one to be drawn from the facts. (*Landberg, supra.*)

This court is bound by the trial court's determination of facts based upon substantial evidence and reasonable inferences to be drawn therefrom. When different inferences may be drawn from undisputed fact, the inference must be accepted by the appeal court. However, a trier of fact may not indulge in inferences rebutted by clear, positive and uncontradicted evidence. (*Hicks* v. *Reis* (1943) 21 Cal.2d 654, 660 [134 P.2d 788].) Moreover, an inference drawn from facts must be distinguished from a *question of law.* (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, §§ 255, 256, p. 4247.) Where the question is one of law derived from undisputed facts, the appeal court is not bound by the trial court's finding on an ultimate issue. (*Joiner* v. *City of Sebastopol* (1981) 125 Cal.App.3d 799, 803 [178 Cal.Rptr. 299].) And what is "reasonable" on undisputed facts is a question of law. (*House* v. *Hornburg* (1943 Supreme Ct.) 39 N.Y.S.2d 20, 21; *Franklin Paint Co.* v. *Flaherty* (1973) 139 Me. 330 [29 A.2d 651, 652].)

■ The trial court's determination the Department's conduct was reasonable and Fullerton's delay in filing the claims was unreasonable are conclusions of law which this court may review. Significantly, the conclusion of unreasonableness on Fullerton's part is totally inconsistent with the court's express fact findings that: (a) the December 1976 letter discouraged Fullerton from filing the claim for additional ADA funds and (b) the letter resulted in Fullerton suspending its data collection activities. To say that Fullerton's reliance on the Department's representations and publications was unreasonable is to ignore the Department's own evidence of less than candid dissemination of information.

Finally, the Department points to no public policy that precludes application of the estoppel doctrine. That public funds were expended is a no-weight argument. The payments made via amended applications were expressly authorized by law and the Department's legal experts. We find no bar to the successful

assertion of estoppel against the Department's unilateral recapture of funds lawfully paid to Fullerton.

## III

Fullerton does not rely upon estoppel alone but has further arrows in its legal quiver: It is argued the 1979 amendments to section 46140.5 contravene due process and equal protection standards; that as a matter of constitutional law, the Department could not recapture the funds granted. Fullerton asserts the purpose of section 46140.5 was to achieve a differential impact between school districts, by eliminating the *preexisting* rights of the five districts who filed late claims. In support of this argument, Fullerton makes an eloquent analysis of educational funding concepts as articulated in the landmark *Serrano* v. *Priest* cases. (See *Serrano* v. *Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241] (*Serrano I*); and *Serrano* v. *Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929], cert. den. *sub nom. Clowes* v. *Serrano* (1977) 432 U.S. 907 [53 L.Ed.2d 1079, 97 S.Ct. 2951] (*Serrano II*).)

The 1977 and 1979 amendments sought to establish separate and unequal treatment of California school districts in the oblique award of extra ADA funds to Garden Grove. Whether the blatant differential treatment violates the constitutional promise of equal protection need not be addressed for there are more immediate, and totally dispositive questions to be resolved. Principles of judicial self-restraint produce a reticence to examine the constitutional challenges to the 1979 amendment. ■ A court will not decide a constitutional question when other grounds are available and dispositive of the issues. (*Palermo* v. *Stockton Theatres, Inc.* (1948) 32 Cal.2d 53, 66 [195 P.2d 1].)

## IV

■ The foregoing analysis and disposition of estoppel principles is based upon the as-yet-unexplored premise that the Department had the right under applicable statutes to recapture the funds granted to Fullerton. This position does not withstand critical analysis. The answers to the following questions expose the anatomy of trial court error as a matter of law. First: Does the 1979 addition to 46140.5 express any legislative intent to authorize the recapture action taken here? Second: If the language is susceptible to such an interpretation, may it be enforced retroactively without touching constitutional nerves?

Two years after the 1977 amendment authorizing payment, the Legislature again amended 46140.5.[8] The Department interpreted this amendment to

---

[8]As amended in 1979 section 46140.5 provides, in part: "As a clarification of the intent of the law, a district, which had not submitted attendance documents of pupils pursuant to Section 46140 under a vocational education program occupationally organized and conducted under

authorize reclamation of funds received by school districts for amended claims filed after the time the attendance reports for the 1976-1977 school year were originally due. Nevertheless, while this 1979 amendment to section 46140.5 was pending, the Department dispensed $6.4 million to five school districts, including Fullerton. An analysis prepared by the Ways and Means Committee staff declared the bill was necessary to "avoid unwarranted claims and district revenue limit increases which may total from $27 to $100 million annually." However, its purpose according to author Senator Joseph B. Montoya was to permit the state to recover the $6.4 million "by amending this bill back." This is the author's statement of *his* intent.[9] In contrast neither the legislative history, which we may examine (*People* v. *Tanner* (1979) 24 Cal.3d 514, 520 [156 Cal.Rptr. 450, 596 P.2d 328]), nor close scrutiny of language in the statute itself discloses any hint of an intent to authorize the Department to "claim back" the funds or to prescribe a procedure for such action.[10]

The plain language to 1979 amendment to 46140.5 states a prospective bar to amended reports. Thus, as to *filing* an amended claim, the statute spoke *prospectively* when the amendment declared "a district, which *had not submitted* attendance documents . . . *shall not have the right at a later date to submit amended attendance documents . . . .*" (Italics added.)

The word "shall" imports *futurity* as well as command. And as used in the phrase "shall not have the right at a later date" is an express limitation on rights to file amended claims in the future. (*People* v. *Allied Architects Assn.* (1927) 201 Cal. 428, 437 [257 P. 511].)

Furthermore, as a general rule of construction, statutes are not to be given retroactive effect unless the intent of the Legislature cannot be otherwise satisfied. " 'The Legislature, of course, is well acquainted with this fundamental rule, and when it intends a statute to operate retroactively it uses clear language to accomplish that purpose.' " (*Balen* v. *Peralta Junior College Dist.* (1974) 11 Cal.3d 821, 828 [114 Cal.Rptr. 589, 523 P.2d 629].)

The statute under construction plainly declares if the attendance documents were not timely filed they shall not be filed later. In sum, the 1979 statute

---

federal approval in 1976-77, other than a regional occupational program or regional occupational center, at the time the attendance reports were originally due, shall not have the right at a later date to submit amended attendance documents to have credited this attendance."

[9]There is a judicial hesitance to rely upon the statement of the author of a bill as to *his* intent or the intent of the body as an aid in the search for legislative purpose in the statute. (See *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 258 [104 Cal.Rptr. 761, 502 P.2d 1049], and dissent per Sullivan, J., p. 283); *In re Marriage of Bouquet* (1976) 16 Cal.3d 583, 589 [128 Cal.Rptr. 427, 546 P.2d 1371].

[10]The Legislative Analyst states: "This double accounting has already cost the state $6.4 million in payments to 5 districts . . . ." "*Amended claims made by the five districts would thus be allowed under the bill.*"

*"would revoke the right of at least one district to claim certain 1975-76 vocational education a.d.a. within what amounts to a three-year statute of limitations."* (Sen. Com. on Education, March 28, 1979, Staff Analysis of Sen. Bill No. 387 (Montoya) (Urgency); italics added.) As a matter of statutory construction and legislative purpose Fullerton's legal position should be sustained. The 1979 amendment to 46140.5 prohibits *a future filing of an amended claim. It does not authorize a retroactive recapture of funds paid.*

## V

The Department, however, ignores this dispositive plain language of the 1979 amendment as well as the legislative history and vigorously argues a second subsidiary issue. It maintains 46140.5 was not retroactive legislation because the amendment *did not alter* the law which preceded it. The statute is simply a "clarification" of legislative intent in enacting 46140.

To support this contention the Department engages in pure sophistry. It asserts section 46140.5 "as it presently exists, does not give the relevant transaction (i.e., the June 8, 1979 payment of funds to Fullerton) any *different legal effect.*" This would truly be news to Fullerton for Fullerton has had $3.2 million withheld from its ADA allotment as a result of the Department's views on the legal effect of this *amendment.* To argue the amendment does not create a "different legal effect" is to pretend Fullerton still has its $3.2 million to carry on the vocational education programs instituted in reliance the funds were forthcoming and were in fact paid.

The Department, despite its protestation, seeks to interpret 46140.5 as a retrospective law. ■ A retroactive law is one which relates back to a previous transaction and gives it a different legal effect from that which it had under the law when it occurred. A retrospective statute is one that operates on matters that have occurred, or on rights, obligations and conditions that existed, before the time of its enactment, giving them an effect different from that which they had under previously existing law. (*American States W. S. Co.* v. *Johnson* (1939) 31 Cal.App.2d 606, 613 [88 P.2d 770]; *Jenkins* v. *Workmen's Comp. Appeals Bd.* (1973) 31 Cal.App.3d 259, 263-264 [107 Cal.Rptr. 130]; *Westfield-Palos Verdes Co.* v. *City of Rancho Palos Verdes* (1977) 73 Cal.App. 3d 486, 493 [141 Cal.Rptr. 36].)

Application of a statute to destroy mature interests before its enactment is generally disfavored. (*Balen* v. *Peralta Junior College Dist., supra,* 11 Cal.3d 821, 830.) Although retrospective statutes are not per se invalid, if the law deprives a party of a vested or substantive right it will not be upheld. (*Westfield, supra,* 73 Cal.App.3d at p. 493.)

In *Flournoy* v. *State of California* (1964) 230 Cal.App.2d 520, 532 [41 Cal.Rptr. 190], the court sought to define when a right is "vested" so as to be immune from the effects of retroactive legislation. The court concluded "no definitive rule is possible" but stated certain policy factors for guidance: " '[T]he nature and strength of the policy interest served by the statute, the extent to which the statute modifies or abrogates the asserted preenactment right, and the nature of the right which the statute alters.' " (*Ibid.;* see also *In re Marriage of Bouquet, supra,* 16 Cal.3d 583, 592.)

■ The Department argues the purpose of 46140.5 was to correct the earlier technical drafting error and thereby to reclaim the $6.4 million paid and at the same time to enable Garden Grove to continue receiving the payments. The clear policy interest appropriately served by this amendment was preservation of the public treasury from future claims.[11] At the same time Garden Grove's continued receipt of these funds was obtusely authorized. This continuing authorization for double ADA to Garden Grove demonstrates again there is no basis to conclude that a *retroactive* application of this amendment was intended for public fisc reasons. Any public policy interest of such magnitude to justify retrospective application of the amendment has yet to be articulated in this cause.

Fullerton claims its right to file for additional ADA funds under section 46140 was vested; that the 1979 amendment as the Department would interpret it unconstitutionally abrogates a vested right. The Department argues this right was not vested but was "contingent" upon the filing of ADA reports and absent that filing the District would not be obligated to pay the funds. The Department asserts "The right to funds under Education Code section 11051 did not *vest* unless and until the ADA credits available under said sections were claimed in an average daily attendance report."

The Department correctly asserts Fullerton's right to receive additional funding was contingent on filing a timely or amended report within the statutory three-year limit. Fullerton initiated steps to comply with the statutory directive but was induced to suspend data collection by the conduct and representations of the Department and for that reason did not file a *timely* application. But Fullerton later acted in full conformity to its statutory right by filing timely *amended* reports pursuant to section 41341. The Department conceded it was obligated to pay the funds to Fullerton. Thus Fullerton had a lawful right to the funds; it lawfully established that right by lawfully amended application and the funds were paid as the then law required.

---

[11](*Ante,* fn. 4.)

## VI

We conclude even if the doctrine of equitable estoppel was inapplicable the statutes compel the identical result. Nothing in the language or legislative history of the 1977 and 1979 amendments suggests the creation of either a substantive or procedural right to unilaterally recapture funds, which by the Department's own admission were lawfully due when paid to Fullerton in June 1979.

Whether it be as a result of the application of the doctrine of estoppel or from the plain words of the legislative enactment, we reach the same conclusion. The Department cannot now assert Fullerton's application was untimely. It may not reclaim those funds which were lawfully paid to Fullerton.

The judgment is reversed with directions to issue the writ of mandate as prayed.

Brown (Gerald), P. J., and Cologne, J., concurred.

## Appendix A

To: Rex Fortune

cc: Sam Barrett
 Jack Lieberman

From: Roger D. Wolfertz
 Legal Office, Rm. 535, 5-4694

Subject: Interpretation of Education Code Section 11051—Memorandum dated June 21, 1976, from Mr. Barrett to Dr. Fortune

Education Code Section 11051 provides in pertinent part that:

> "No pupil in a high school, other than a pupil in a vocational education program occupationally organized and conducted under federal approval, evening high school, continuation high school, or continuation education class, shall be credited with more than one day of attendance in any calendar day . . ."

The *question stated is:*

"Under this code section could a regular vocational education program approved under the California State Plan for Vocational Education and receiving federal support from the Vocational Education Act report more than one day of attendance during a calendar day?"

CONCLUSION:

My conclusion is in the affirmative.

ANALYSIS:

All following section references are to the Education Code.

According to Department of Education staff there seems to be a movement in some districts to use what they say is a "license" in Section 11051 to redirect the vocational education program into district or regional vocational centers rather than regional occupational centers or regional occupational programs. Some districts have interpreted Section 11051 to mean that a separate and unlimited a.d.a. generating base is provided for federally supported vocational education courses maintained in the regular high schools. Using this understanding, districts would set up a vocational education unit within a district, move all vocational education under one administration, claim 180 minute days but allow as many hours as taught to generate a.d.a. and circumvent the ROC/P Budget Act all in the same process (memorandum dated December 12, 1975 from Robert J. Bennett to Jack Lieberman).

Rex Fortune
Page 2
July 16, 1976

Section 11051 is couched in terms of a basic mandatory prohibition with certain exceptions therefrom, specifically, no pupil in a high school shall be credited with more than one day of attendance in any calendar day *except* a pupil enrolled in a vocational educational program occupationally organized and conducted under federal approval, or in an evening high school, continuation high school, or continuation education class. An exception exempts a thing or person absolutely from the operation of a statute (Black's Law Dictionary, Fourth Edition). *Exempting pupils in vocational education and continuation high schools and continuation education classes from the basic prohibition leaves an apparent authority to credit attendance of those pupils in excess of one day per calendar day unless other provisions of the Education Code or legislative expression indicates to the contrary.* For example, in 58 Ops. Atty. Gen. 146, language of apparent authority in Section 14005, dealing with payment for accumulated sick leave, was deemed to be a nullity because the legislature concurrently failed to pass two bills providing express authority for such payments. In connection with 59 Ops. Atty. Gen. 119, the Attorney General, in a letter opinion to the Department of Education legal office dated May 5, 1976, decided that the apparent authority in Section 5992 is actual authority for work experience education to be conducted in ROC/Ps because, presumably, no other statute or legislative intent to the contrary was found.

Using the Attorney General's approach, we find contrary legislative intent to the apparent authority with respect to continuation education and ROC/P operation. For example, Section 11053 states that "In continuation high schools and continuation education classes, a day of attendance is 180 minutes of attendance *but no pupil in any such school or class shall be credited with more than 15 hours of attendance in*

*any calendar week"* (emphasis added). In regional occupational centers and programs, Sections 7461 and 7462 merely set the minimum day at 60 minutes for an ROP and 180 minutes for an ROC. However, an apportionment limit for ROC/P attendance is imposed by the Budget Act of 1975 (Item 320.1(d)(1), Chapter 176, Statutes of 1975), and the Budget Act of 1976 (S.B. 1410, Item 332(d)).

Courses in vocational education are required to be offered in every high school curriculum (Section 8571(i)). Thus, while high school pupils enrolled in such courses are, by reason of Section 11051, precluded from generating more than one day of attendance, *Section 11051 exempts from such limitation attendance in those vocational education programs organized and conducted under federal approval.* There being no express statutory provision in the Education Code or any specific legislative intent to the contrary, and based on the Attorney General's analysis in 58 Ops. Atty. Gen. 146 and in his Letter Opinion of May 5, 1976, *supra, I am compelled to conclude that what first may seem to be merely an apparent authority to generate excess a.d.a. with respect to federally approved vocational education courses, is an actual authority.* There are, however, specific exceptions to this authority, for example: no state apportionment can be claimed for attendance (1) in any vocational training class provided by any program of national defense of the federal government where the total cost of class is borne by the federal government (Section 5901) or (2) in any vocational training pilot program the total cost of which is borne by the federal government (Section 5901.5).

Roger D. Wolfertz
Staff Counsel III

RDW:ph