Filed 2/4/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BRET STEPHEN LANDEN,<br><br>    Defendant and Appellant. | 2d Crim. No. B286062<br>(Super. Ct. No. 15F-11592)<br>(San Luis Obispo County) |

The victim of this crime is a local school district. The defendant is ordered to pay restitution to the school district. Some of the loss the school district suffered was reimbursed by the state.

Because of the state's inextricable relationship to the school district, the state is also a direct victim of the defendant's crime and is entitled to restitution. (*Butt v. State of California* (1992) 4 Cal.4th 668, 680.) The amount of restitution the defendant must pay does not change. Only the party to whom some of that restitution must be paid changes. However reprehensible a defendant's conduct, restitution due the victim should not exceed the loss suffered.

Bret Stephen Landen appeals a judgment following his no contest plea to making threats to use a weapon of mass destruction (Pen. Code, § 11418.5, subd. (a))[1] and making criminal threats (§ 422, subd. (a)). The trial court placed him on five years of supervised probation. After a restitution hearing, it ordered him to pay the Atascadero Unified School District (District) $235,341.17 as restitution. We conclude, among other things, that the court should reduce the amount of restitution to the District by the amount of reimbursement the District received from the State of California (State) ($68,722.56) for average daily attendance (ADA) funds. We reverse. On remand, the trial court shall order Landen to pay restitution to the State in the amount of $68,722.56. In all other respects, we affirm.

FACTS

During June or July 2015, Landen stole the keys to the San Gabriel Elementary School, a school which is part of the District.

On September 11, 2015, Landen locked the entrances to that school and placed a jar containing a liquid mixture of "sodium and cyanide" three feet off the ground, near a play area where it was "easy for children to reach it." He left black envelopes for the teachers of the school with the following note inside:

"I want to play a game. Inside the package before you hold [*sic*] a key to the classroom. However, there is a catch. Three of your colleagues have the unfortunate situation where their keys are switched. Furthermore, an additional four teachers will have to retrieve four keys that will unlock the corresponding pad locks that currently deny the children's entrance to the school. In order to further the safety of your children, four of you need to

_____

[1] All statutory references are to the Penal Code.

2

obtain the keys that are located in a jar, connected to the fence, adjacent to the play structure.  If these tasks are not completed by 8:00 am, there will be consequences to follow, possibly affecting the children.  Make your choice."

A "digital recorder" was near the glass jar containing the cyanide and sodium liquid.  Landen left a note close to the jar, which read, "Congratulations, you have found the jar that contains the keys.  As you can see, there is a liquid that surrounds the keys.  Be aware that the solution is a combination of liquids that release a very poisonous cyanide gas.  Also, the liquid happens to be a relatively strong acid."

Landen left a note on the digital recorder stating, "Play me."  In a digital recording in a "disguised voice," Landen said, "Hello there.  Most of you are probably wondering about the invitation at your doors.  This is a game to test your ability of how far each and every one of you is willing to go in order to secure the safety of your children.  As you can see, there are not four keys, but five.  There is an additional lock that must be unlatched before your time is up.  Get to it.  The clock is running out."

The police investigated and discovered that the items used in the crime were not purchased locally.  Law enforcement was eventually able to trace these items to purchases made by Landen on Amazon.

Landen admitted he committed the offense.  He said that "he felt good carrying out his plot and that he experienced an overwhelming sense of excitement."  He said that "[h]e wanted the teachers to feel fear."

The probation department recommended that as a result of Landen's actions he should pay restitution to the District in the amount of $456,163.09.

The trial court held a restitution hearing. Tom Butler, the District's superintendent, Jackie Martin, a District assistant superintendent, and Curt Eichberger, the District's assistant superintendent for human resources, testified about the District's financial expenses and losses incurred as a result of Landen's actions. Butler said Landen's acts caused a "direct impact on the financial solvency" of the District. The San Gabriel school had to be closed for two weeks. Students and staff were transported to other District schools. There was a "[l]oss of revenue for reduced [school] attendance district wide." There were increased labor, overtime, construction and security costs because of the September 11, 2015, incident.

The trial court found the District was a direct victim and Landen's threats were directed at District staff and caused "a significant sense of terror" for "parents and community members." It said restitution serves the "probationary goal of rehabilitating the defendant" and making him "confront . . . the harm his actions have caused." As a result of his crime, the San Gabriel school had to be closed and "taken over" by law enforcement "as a crime scene." The District incurred substantial costs for chemical testing and security costs. Students had to be "relocated to other elementary school campuses."

The trial court ordered Landen to pay restitution to the District in the total amount of $235,341.17. In reaching this amount, it found nine restitution categories were reasonable, which included: 1) $ 2,778.88 to rekey classrooms at San Gabriel; 2) $21,728.22 for security costs to supervise or monitor the school;

4

3) $11,933.87 for relocation expenses; 4) $23,810.23 for additional costs for ongoing construction due to security concerns; 5) $19,044.14 for administrative costs "to stabilize the work force over the weekend and engage in relocating a school within 48 hours without having access to the school"; 6) $94,669 for losses in ADA revenue for San Gabriel and other District schools due to school children being relocated and parents fears about school safety; 7) $32,585.75 for chemical testing; 8) $8,245.16 for "classroom lockdown kits" distributed "across the school District"; and 9) $20,545.92 for a "visitor software system."

The trial court also found that the District had received "partial reimbursement" for the loss of ADA funding from the State in the amount of $68,722.56.

## DISCUSSION

*The Amount Ordered as Restitution to the District*

Landen contends the trial court should not have ordered restitution to the District for expenses not directly related to the incident at the San Gabriel school as a condition of probation.

We review the trial court's conditions of probation for abuse of discretion. (*People v. Moran* (2016) 1 Cal.5th 398, 403.) "[A] reviewing court will disturb the trial court's decision to impose a particular condition of probation only if, under all the circumstances, that choice is arbitrary and capricious and is wholly unreasonable." (*Ibid.*)

"In granting probation, courts have broad discretion to impose conditions to foster rehabilitation and to protect public safety pursuant to Penal Code section 1203.1." (*People v. Carbajal* (1995) 10 Cal.4th 1114, 1120.) "Restitution has long been considered a valid condition of probation." (*Id.* at p. 1121.) "[A]n order for restitution, which attempts to make a victim

5

whole, 'has generally been deemed a deterrent to future criminality'. . . ." (*Id.* at p. 1123.) "There is no requirement the restitution order be limited to the exact amount of the loss in which the defendant is actually found culpable, nor is there any requirement the order reflect the amount of damages that might be recoverable in a civil action." (*Ibid.*)

The trial court's discretion in ordering restitution is broad, but not unlimited. (*People v. Carbajal, supra*, 10 Cal.4th at p. 1121.) It may not order excessive restitution amounting to an unreasonable windfall for a victim. (*In re Anthony M.* (2007) 156 Cal.App.4th 1010, 1017.) It should compensate a victim for actual losses, but never overcompensate a victim. (*People v. Chappelone* (2010) 183 Cal.App.4th 1159, 1172.)

Landen claims he did not cause "physical harm" to any "school property" or any "person present" and the District is not a "direct victim." He targeted the San Gabriel school, not the District. He contends the District sought restitution for security and other costs unrelated to the San Gabriel school.

But the San Gabriel school is part of the District and Landen minimizes the impact of his actions on the District. He made criminal threats and used a deadly substance – cyanide. Law enforcement was not able to immediately identify a suspect. A school had to be closed. Landen targeted District teachers and the District believed this was not an isolated incident. Keys and cyanide reflected careful planning. This was not a harmless prank.

Landen terrorized District educators on September 11, the anniversary of the World Trade Center attack. District administrators believed the District had been targeted by an unknown terrorist. They incurred substantial costs by taking

6

steps consistent with their duty to protect the District's students and faculty. (*Dailey v. Los Angeles Unified School Dist.* (1970) 2 Cal.3d 741, 747.) Butler said Landen's actions caused a "direct" impact on the District's "financial solvency."

*Lockdown Kits and the Visitor Software Program*

Landen contends restitution for "lockdown kits for all [District] schools" and the "visitor software program" is not authorized. He claims restitution is only proper for the loss of ADA revenue at the San Gabriel school, not other District schools. He argues the order to pay $23,810.23 for increased construction costs at the San Gabriel school was improper.

Eichberger testified the District's "Safety Committee" determined lockdown kits for students and a software system to identify and screen all school visitors were necessary for the District's schools. Those measures had not been instituted before the September 11, 2015, incident. Butler said various security measures and costs "would not have been necessary if it were not for the horrific event at San Gabriel Elementary School."

Teachers whom Landen targeted at the San Gabriel school had to be transferred to other District schools when the San Gabriel school was closed for chemical testing and a police investigation. Butler said law enforcement had obtained evidence showing a threat "to other students in the District." Landen had shown his ability and intent to enter a District school to target teachers. He had placed a dangerous substance within the reach of children. The District had a duty to protect its teachers and students. (*Dailey v. Los Angeles Unified School Dist.*, *supra*, 2 Cal.3d at p. 747.) The trial court reasonably inferred these safety measures were the result of, and reasonably related to, Landen's crimes. The restitution order was well

7

within the trial court's discretion. (*People v. Tarris* (2009) 180 Cal.App.4th 612, 624-626.)

### Increased Construction Costs

The trial court found $23,810.23 in increased construction costs at the San Gabriel school was "reasonably related to Mr. Landen's crimes." It did not err. Butler testified there was an ongoing construction project at the school when it had to be closed because of Landen's threats. The suspect had not been apprehended and there was a belief that a "trades person working on [that project]" may have been responsible for the September 11, 2015, incident. The District decided to have construction proceed at night "when students were not there." It was concerned for the safety of its students. (*Dailey v. Los Angeles Unified School Dist.*, *supra*, 2 Cal.3d at p. 747.) It incurred "swing shift employment" costs for this reason. The court found that given "the trauma" Landen caused, the decision to incur this special labor expense was appropriate.

The trial court also found this "would aid in the rehabilitation of Mr. Landen under the total circumstances of this case." Landen has not shown error. The court's concern that Landen needed to understand the consequences of his actions was well justified. After his arrest, Landen said that "he felt good carrying out his plot." A defendant must " ' "confront, in concrete terms, the harm his actions have caused." ' " (*People v. Anderson* (2010) 50 Cal.4th 19, 27.) This is a proper goal of probation restitution. (*People v. Carbajal*, *supra*, 10 Cal.4th at p. 1123.)

### Loss of Revenue for District ADA Funds

The closing of the San Gabriel school and the transfer of its students and faculty to other District schools produced a climate

of fear throughout the District.  Many parents decided to keep their children out of District schools.  Martin testified the District receives State money based on the ADA.  Butler said there was "a dramatic decrease in attendance across [their] school district," causing a loss of ADA revenue in the amount of $94,669.  He said this was a "direct cost associated with the incident on September 11, 2015."  The District's ADA loss of revenue was reasonably related to Landen's crimes.

But as Landen correctly notes, the trial court also found the District received "partial reimbursement" from the State for the loss of ADA funding in the amount of $68,722.56.  The court did not subtract this amount from its restitution order.

Martin testified the District applied for an ADA "waiver," the State granted it and *recalculated* ADA funding.  The State then sent $68,722.56 in ADA funds to the District.  Landen notes the trial court incorrectly calculated the District's ADA loss. That loss was not $94,669; it was only $25,946.44 (the difference between $94,669 and the $68,722.56 ADA funds the District actually received).  The court has broad discretion to determine restitution as a probation condition.  (*People v. Carbajal*, *supra*, 10 Cal.4th at p. 1121.)  In the ordinary case, the court abuses its discretion if it orders restitution at an amount *several times higher* than the victim's actual loss.  (*People v. Whisenand* (1995) 37 Cal.App.4th 1383, 1391; *People v. Baumann* (1985) 176 Cal.App.3d 67, 76.)  But such an abuse will not occur here.

*Restitution to the State*

The trial court ordered restitution to the District in the amount of $68,722.56 it received from the State to reimburse it for its loss of ADA funding.  We asked for additional briefing on whether the trial court has authority to now order Landen to pay

9

restitution to the State for that $68,722.56 amount. Counsel for the parties cited inapplicable authority, mostly involving victim restitution relating to insurance policies.

We conclude the trial court has authority to order restitution to the State. Why? Because the State is a direct victim of defendant's crime. "Public education is an obligation which the State assumed by the adoption of the Constitution. (*San Francisco Unified School Dist. v. Johnson* (1971) 3 Cal.3d 937, 951-952 [92 Cal.Rptr. 309, 479 P.2d 669]; *Piper v. Big Pine School Dist.* (1924) 193 Cal. 664, 669 [226 P. 926].) The system of public schools, although administered through local districts created by the Legislature, is '*one* system . . . applicable to all the common schools . . . .' (*Kennedy v. Miller* (1893) 97 Cal. 429, 432 [32 P. 558], italics in original.)" (*Butt v. State of California*, *supra*, 4 Cal.4th at p. 680.) Under the broad provisions of section 1203.1, the court may order the defendant to pay victim restitution.

The restitution statutes authorize trial courts to "retain jurisdiction" for the purpose of "imposing or modifying restitution" so that eligible victims will receive the restitution to which they are entitled. (*People v. Bufford* (2007) 146 Cal.App.4th 966.) "The government may be the beneficiary of . . . reimbursement if it has incurred actual loss due to the crime." (*People v. Tarris*, *supra*, 180 Cal.App.4th at p. 622.)

Landen's interruption of school attendance was a crime affecting the District and the State. The State is responsible for maintaining adequate educational funding based on student ADA figures. (*Butt v. State of California*, *supra*, 4 Cal.4th at p. 704; *Fullerton Union High School District v. Riles* (1983) 139 Cal.App.3d 369, 373.)

10

Where there is a drop in attendance due to a wrongdoer's criminal act which creates a funding crisis, the State is a victim. The State is responsible for obtaining the funds necessary to address the crisis and support the educational process. It has the "plenary constitutional responsibility for operation of the common school system." (*Butt v. State of California*, *supra*, 4 Cal.4th at p. 704.) Because the District was unable to financially meet its responsibility, the State paid these funds which reduced its State ADA funding reserve. An order requiring Landen to pay restitution to the State falls within the trial court's discretion to order restitution as a probation condition to require the defendant to face the consequences of his criminal acts.

DISPOSITION

The portion of the restitution order that ordered Landen to reimburse the District for $68,722.56 for partial ADA reimbursement it received from the State is reversed. On remand, the trial court shall order Landen to pay restitution to the State for that $68,722.56 amount. In all other respects, the order is affirmed.

CERTIFIED FOR PUBLICATION.


GILBERT, P. J.

We concur:


PERREN, J.


TANGEMAN, J.

11

Jacquelyn H. Duffy, Judge

Superior Court County of San Luis Obispo

———————————————

Jolene Larimore, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Colleen M. Tiedemann, Viet H. Nguyen, Deputy Attorneys General, for Plaintiff and Respondent.