Filed 8/29/23  Reyes v. State of California CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| OLENA REYES, a Minor, etc., et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>Defendants and Respondents. | C095084<br><br>(Super. Ct. No. 34202080003489CUWMGDS) |
| SAMAIYA ATKINS, a Minor, etc., et al.,<br><br>Plaintiffs and Appellants,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>Defendants and Respondents. | C095085<br><br>(Super. Ct. No. 34202080003436CUWMGDS) |

1

Charter schools in California receive funding based on a specific statutory scheme. As in countless other ways, the COVID-19 pandemic caused the Legislature to take steps, with respect to school funding, to adapt to extraordinary circumstances. In 2020, the Legislature enacted Senate Bill No. 98 (Senate Bill 98) (Stats. 2020, ch. 24) which, insofar as relevant here, amended the Education Code to fix school funding for the 2020-2021 fiscal year at 2019-2020 fiscal year levels.[1] Later in 2020, the Legislature enacted Senate Bill No. 820 (Senate Bill 820) (Stats. 2020, ch. 110),[2] which amended the Education Code to provide that a continuing local educational agency shall be eligible for apportionment reflecting growth from 2019-2020 levels to projected 2020-2021 levels. However, Senate Bill 820 further provided the provision for funding taking projected growth into account was not applicable to non-classroom-based (NCB) charter schools. These laws only impacted the 2020-2021 fiscal year and were repealed as of January 1, 2022.

This appeal involves two suits challenging these legislative actions. Plaintiffs in *Atkins et al. v. State of California et al.* (C095085), a nonprofit public benefit corporation operating the John Adams Academy charter school on three campuses and six students filed an amended petition for a writ of mandate and verified complaint for declaratory relief challenging Senate Bill 98 and Senate Bill 820. Plaintiffs in *Reyes et al. v. State of California et al.* (C095084), three nonprofit corporations that operated NCB charter schools and 13 students, separately filed a petition for a writ of mandate and verified complaint containing causes of action and prayers for relief largely the same as those in

---

[1] Further undesignated statutory references are to the Education Code.

[2] Plaintiffs refer to these two laws collectively as the "Student De-funding Law." The state refers to them as the "Hold Harmless Law." We could find neither of these designations specifically employed by our Legislature in reference to these enactments. We refer to them collectively as the Senate Bills.

*Atkins*. After joint briefing and oral argument, the trial court denied the petitions and dismissed the complaints. Plaintiffs appealed and we granted the parties' joint motion for consolidation of the appeals for all relevant purposes.

On appeal, plaintiffs raise two principal contentions. First, they assert their charters, upon approval, created a contractual relationship with defendant State of California (the State) and that the State breached those contracts, thus violating the contract clause of the California Constitution, by unilaterally abandoning their contractual obligation to fund each charter school commensurate with actual enrollment/average daily attendance (ADA). Second, plaintiffs assert the Senate Bills violated their substantive due process rights because they "deprive[d] them of their property rights – rights to receive funding for each student that vested upon approval to operate charter schools for the State and to enroll students."

We affirm.

## BACKGROUND

*Education and Funding for Education in California*

"The Legislature shall provide for a system of common schools by which a free school shall be kept up and supported in each district at least six months in every year, after the first year in which a school has been established." (Cal. Const., art IX, § 5.) As of 2020-2021, "California provides instruction and support services to roughly six million students in grades kindergarten through twelve in more than 10,000 schools throughout the state." The State accomplishes this through a "system of 58 county offices of education, 1,000 local school districts, and more than 1,200 charter schools."

The California Supreme Court has recognized "the distinctive and priceless function of education in our society warrants, indeed compels, our treating it as a 'fundamental interest.' " (*Serrano v. Priest* (1971) 5 Cal.3d 584, 608-609, fn. omitted.) The Supreme Court has also pronounced that, "[s]ince its admission to the Union, California has assumed specific responsibility for a statewide public education system

3

open on equal terms to all," and that, "[i]n view of the importance of education to society and to the individual child, the opportunity to receive the schooling furnished by the state must be made available to all on an equal basis. . . ." (*Butt v. State of California* (1992) 4 Cal.4th 668, 680.)

The California Constitution contains a provision for public school funding, although this constitutes a floor for such funding: "The entire State School Fund shall be apportioned in each fiscal year in such manner as the Legislature may provide, through the school districts and other agencies maintaining such schools, for the support of, and aid to, kindergarten schools, elementary schools, secondary schools, and technical schools except that there shall be apportioned to each school district in each fiscal year not less than one hundred twenty dollars ($120) per pupil in average daily attendance in the district during the next preceding fiscal year and except that the amount apportioned to each school district in each fiscal year shall be not less than twenty-four hundred dollars ($2,400)." (Cal. Const., art IX, § 6.) While the foregoing furnishes a constitutional minimum for funding, the Education Code specifies that the "system of public school support should assure that state, local, and other funds are adequate for the support of a realistic funding level." (§ 14000.)

"California school finance is enormously complex, but the basic system is that 'funds raised by local property taxes are augmented by state equalizing payments. Each school district has a base revenue limit that depends on average daily attendance, . . . and varies by size and type of district. [¶] The revenue limit for a district includes the amount of property tax revenues a district can raise, with other specific local revenues, coupled with an equalization payment by the state, thus bringing each district into a rough equivalency of revenues.' " (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1186, fn. 10 (*Wells*).)

4

*Charter Schools and the Charter Schools Act of 1992*

Charter schools are a relatively recent addition to California's educational landscape. With the enactment of the Charter Schools Act of 1992 (§ 47600 et seq., added by Stats. 1992, ch. 781, § 1) (CSA), "California became one of the first states in the country to authorize charter schools." (*Anderson Union High School Dist. v. Shasta Secondary Home School* (2016) 4 Cal.App.5th 262, 268, fn. omitted.) "The Legislature intended its authorization of charter schools to improve public education by promoting innovation, choice, accountability, and competition." (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 205-206 (*Today's Fresh Start*).)

"Charter schools are 'public schools funded with public money but run by private individuals or entities rather than traditional public school districts.' " (*Anderson Union High School Dist. v. Shasta Secondary Home School, supra*, 4 Cal.App.5th at pp. 267-268, quoting *Today's Fresh Start, supra*, 57 Cal.4th at p. 205.) "For certain purposes, the [charter] school is 'deemed to be a "school district" ' [citation], is 'part of the Public School system' [citation], falls under the 'jurisdiction' of that system, and is subject to the 'exclusive control' of public school officers." (*Wells, supra*, 39 Cal.4th at p. 1186.)

The process for establishing a new charter school is set forth in the Education Code. (§ 47605.) The process involves circulation of a complying petition for the establishment of a charter school within a school district with the proposed charter. (§ 47605, subd. (a)(1), (3).) Generally, "[f]ollowing review of the petition and [a] public hearing, the governing board of the school district shall either grant or deny the charter within 90 days of receipt of the petition . . . ." (§ 47605, subd. (b).)

"Charter schools shall be entitled to full and fair funding . . . ." (§ 47615, subd. (a)(3).) Although the way in which a charter school receives funding is complex, it is sufficient here to note that a charter school's share of state and local public education

5

funds is calculated based on considerations that include its ADA. (*Wells, supra*, 39 Cal.4th at p. 1186.)

*The Senate Bills*

In response to circumstances caused by the COVID-19 pandemic, immediately before the beginning of the new fiscal year in 2020, the Legislature enacted Senate Bill 98, effective June 29, 2020. Among other things, that legislation added former sections 43500 through 43511 to the Education Code. (Stats. 2020, ch. 24, § 34.) By the terms of Senate Bill 98, those provisions were to become inoperative on June 30, 2021, and repealed as of January 1, 2022. (*Ibid.*) As enacted by Senate Bill 98, former section 43502 provided, in pertinent part: "Notwithstanding Sections 41601, 42238.05 to 42238.053, inclusive, and 46010, *for purposes of calculating apportionments for the 2020-21 fiscal year for a local educational agency*,[3] except for a new charter school that is authorized by the governing board of a school district or county board of education on or before June 1, 2020, or approved by the state board at its July 8 and 9, 2020, meeting and that is beginning instruction in the 2020-21 school year, *the department shall use the average daily attendance in the 2019-20 fiscal year* reported for both the second period and the annual period apportionment that included all full school months from July 1, 2019, to February 29, 2020, inclusive, and extended year average daily attendance attributed to the 2019-20 school year reported pursuant to Section 96 of the act adding this part." (Former § 43502, subd. (b), italics added.) Thus, this provision essentially provided that funding for the 2020-2021 fiscal year would be fixed at 2019-2020 fiscal year levels. Former section 43505, subdivision (b)(1) extended this provision to NCB schools.

---

[3] " 'Local educational agency' means a school district, a county office of education, a nonprofit charter school participating as a member of a special education local plan area, or a special education local plan area." (§ 56026.3.)

Later in 2020, the Legislature enacted Senate Bill 820. Among other things, that legislation amended former sections 43502 and 43505. (Stats. 2020, ch. 110, §§ 13, 17.) Senate Bill 820's amendment to section 43505, subdivision (b) provided that a continuing local educational agency shall be eligible for apportionment reflecting growth from actual 2019-2020 levels to *projected* 2020-2021 levels. (Former § 43505, subd. (b)(1)(A).) Senate Bill 820 also added subdivision (c) to former section 43505, which provided, in part: "(c)(1) A[n] [NCB] charter school described in Section 47612.5 as of the 2019-20 second principal apportionment certification shall not be eligible for an apportionment calculation pursuant to subdivision (b). [¶] (2) For purposes of calculating apportionments for the 2020-21 fiscal year and for any other calculations that would be based on [ADA] in the 2020-21 school year, for a[n] [NCB] charter school described in Section 47612.5 as of the second principal apportionment certification for the 2019-20 fiscal year, the department shall use the [NCB] charter school's [ADA] in the 2019-20 fiscal year pursuant to subdivision (b) of Section 43502." (Former § 43505, subd. (c)(1)-(2), added by Stats. 2020, ch. 110, § 17.) In other words, the provision providing for funding taking projected growth into account was not to apply to NCB schools.

*Procedural Background*

Plaintiffs in *Atkins* include a nonprofit public benefit corporation organized to operate the John Adams Academy charter school on three campuses and six individual students enrolled at John Adams Academy's Lincoln campus. They filed an amended petition for a writ of mandate and verified complaint for declaratory and injunctive relief. They sought: (1) a writ of mandate compelling defendants to comply with the law by disbursing "school funding in the 2020-21 school year in proportion with current year ADA, . . . or by providing funding reasonably equivalent to funding available to districts"; (2) a declaration, among other things, that the approval of charters for John James Academy gave rise to an enforceable contract obligating the State to provide funding to John James Academy for each enrolled student commensurate with ADA,

7

consistent with funding available to school districts; (3) a declaration that the Senate Bills violated the contracts clause of the California Constitution because they impaired the State's obligation to timely provide funding based on ADA in each school year and impaired the schools' ability to perform under the terms of the charters; (4) a declaration that that the Senate Bills violated the contract clause, the due process clause, and California's constitutional obligation to fund public schools based on enrollment, as well as statutory funding obligations, and that defendants were obligated to, among other things, apportion funding to charter schools for each enrolled student commensurate with current year ADA; (5) a declaration that the Senate Bills violated the due process clause of the United States and California Constitutions because they "will result in the taking, destruction, withholding, diminishment, or defunding of cognizable legal interests possessed by John Adams Academy without receiving due process of the law"; and (6) a declaration that former section 45308 violated California's constitutional obligation under article XVI sections 8 and 8.5 to apportion funding to public schools each year based on current-year enrollment.

The plaintiffs in *Reyes* included nonprofit corporations operating NCB charter schools, specifically The Classical Academies, River Springs Charter School and Empire Springs Charter School, and The Learning Choice Academy, as well as 13 student plaintiffs who were enrolled or wait-listed at one of plaintiffs' NCB charter schools. Plaintiffs in *Reyes* filed a petition for a writ of mandate and verified complaint for declaratory and injunctive relief. In *Reyes*, plaintiffs also brought the action on behalf of a class of all others similarly situated pursuant to Code of Civil Procedure section 382. Plaintiffs defined the class as "all [NCB] charter schools authorized in California that have or may have unfunded enrollment in the 2020-21 school year. . . ." The trial court granted the *Reyes* plaintiffs' unopposed motion for class certification. The *Reyes* plaintiffs asserted six causes of action that were largely identical to those asserted in *Atkins*, and sought similar relief.

Plaintiffs claim they had been adversely affected by the Senate Bills due to the loss of funding for students they had actually enrolled during fiscal year 2020-2021. Plaintiffs allege that, as of October 7, 2020, their charter schools "had enrolled 16,666 students, but they were only funded for 14,269 students, resulting in a collective funding loss of approximately $21.6 million for 2,397 students; 1,557 of those unfunded students were enrolled in Spring 2020," before enactment of Senate Bill 98.

The parties in *Atkins* and *Reyes* entered into a joint stipulation and order, agreeing to engage in a single cross-briefing cycle for both cases leading to a merits hearing/bench trial and a single final judgment on all claims in both cases.

After oral argument, the trial court entered judgment in favor of the State and the other defendants on all causes of action. The court concluded that "the CSA does not confer contractual rights that [plaintiffs] posit." Later, the court stated: Plaintiffs "have not established any rights against ADA adjudgments, or rights to apportionments more generally, cognizable in contract. As a result, the court need not reach the issue whether such contractual rights may have been unconstitutionally impaired when SB 98 or SB 820 were enacted into law."

Turning to plaintiffs' substantive due process claims, the court determined plaintiffs failed to demonstrate the school plaintiffs had any protectible property interest in state funding. As for the student plaintiffs, the court stated plaintiffs had not established their NCB students had been deprived of their constitutional right to an education during the 2020-2021 fiscal year. As such, "they have not established any violation of a fundamental right that could amount to a substantive due process violation." Additionally, the court concluded plaintiffs failed to demonstrate Senate Bill 98 applied retroactively.

The trial court denied the petitions and dismissed the complaints.

Plaintiffs appealed in both cases, and we granted the parties' joint motion for consolidation of the two appeals for all relevant purposes.

# DISCUSSION

## I

### *Contract Claims*

A.    *The Parties' Contentions*

Plaintiffs assert that charters, upon approval, create contractual relationships with the State. They maintain the Senate Bills abrogated their contractual rights by unilaterally altering fundamental contractual funding terms on which their charters were based. According to plaintiffs, through the Senate Bills, defendants abrogated their contractual rights by altering the funding of each charter school which was to be commensurate with actual enrollment. As a result, plaintiffs assert defendants violated the contract clause of the California Constitution.

Defendants respond that the trial court correctly concluded plaintiffs did not have a contractual right to funding based on current-year ADA. According to defendants, to the extent any contracts exist, they do not contain specific funding provisions. As for the theory that statutes became implied contract terms, defendants assert there is a strong presumption statutes do not create contract rights, and further that the statutes at issue here were subject to change and did not indicate a legislative intent to create any contractual rights. According to defendants, because there is no contractual right to funding, the contract clause is not implicated.

We conclude that, even if contracts exist between the plaintiff charter operators and the State, a matter we need not decide here, plaintiffs have failed to establish that a guarantee of a particular manner or formulation of funding commensurate with actual attendance was a term of those contracts.

B.    *Standard of Review*

We independently review the trial court's conclusions on legal issues, including contract interpretation, statutory construction, and legislative intent. (*Cal Fire Local 2881 v. California Public Employees' Retirement System* (2016) 7 Cal.App.5th 115, 123

10

[on appeal from granting or denial of petition for writ of mandate, we independently review trial court's conclusion on legal issues including legislative intent], affd. (2019) 6 Cal.5th 965; *Dowling v. Farmers Ins. Exchange* (2012) 208 Cal.App.4th 685, 694 [we independently review trial court's interpretation of a contract unless interpretation depends on resolution of factual questions concerning credibility of extrinsic evidence; we also independently review legal questions concerning construction and application of statutes].) Whether a matter is "protected by the constitutional contract clause — that is, whether it is a vested right — is a question of law" also subject to our independent review. (*Cal Fire Local 2881 et al. v. California Public Employees' Retirement System* (2019) 6 Cal.5th 965, 976 (*Cal Fire Local 2881*).)

C.       *Whether Charters Are Contracts and Whether Funding Terms Appear in Charters*

Plaintiffs assert that the proffer of the charters, and the approval of them, gave rise to enforceable contracts between the charter operators and the State. Plaintiffs assert that, "[u]nder California contract jurisprudence, a charter is a contract." (Boldface and some capitalization omitted.)

Courts have *referred* to charters in the charter school context as contracts. In *Knapp v. Palisades Charter High School* (2007) 146 Cal.App.4th 708 (*Knapp*), the court stated that the "charter establishing a charter school is a contract detailing the school's educational programs, goals, students served, measurable pupil outcomes and measurement methods, and the school's governance structure." (*Id*. at p. 714.) For this premise, the *Knapp* court cited section 47605. (*Knapp*, at p. 714.) Section 47605 details the process for petitioning to establish a charter school and approval or denial of the petition. Section 47605 does not explicitly state that an approved petition gives rise to a contract, or mention contracts at all. In *Today's Fresh Start, supra*, 57 Cal.4th 197, the court cited *Knapp* for the parenthetical statement that "charter schools are contractually bound by their charters." (*Id*. at p. 207, citing *Knapp*, at pp. 714-715.) The courts in these cases were not directly answering the question whether approved school charters

11

create contracts obligating the State to comply with any enforceable terms. This dicta in *Knapp* and *Today's Fresh Start* does not affirmatively establish that charters such as those at issue here give rise to valid, enforceable contracts binding the State to any particular terms.

Ultimately, we need not determine whether an approved charter petition gives rise to an enforceable contract between the State and the charter operator. We shall assume for the sake of argument that the charters gave rise to enforceable contracts, but conclude that the particular funding formulation or methodology, specifically funding based on ADA, was not a term of such contracts.

We have reviewed all of the charter petitions implicated here, including those for John Adams Academy – Lincoln, River Springs Charter School, Empire Spring Charter School, The Learning Choice Academy – Chula Vista, The Learning Choice Academy – East County, and The Learning Choice Academy. State funding, funding amounts, and funding methodology or formulation were not terms of any agreements as set forth in these charters to which the State purportedly assented. As such, plaintiffs do not have a cognizable claim in contract for changes made to those funding circumstances, at least insofar as based on the written terms of the charters. (See Civ. Code, § 1639 ["When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone, if possible; subject, however, to the other provisions of this Title"].)

D.    *Whether Statutory Funding Provisions Are Implied Terms of Any Contracts*

Plaintiffs argue that, in return for the promises made in their charters, the State promised to fund the charter schools commensurate with enrollment on an ADA basis. Perhaps tacitly acknowledging no enforceable funding provisions appear in the charters, plaintiffs assert the financial terms of the agreement—the consideration proffered by the State—are "articulated or implied in statute." We turn, then, to the statutes relevant to funding to determine whether they could be deemed implied contractual terms incorporated into the alleged agreements between the parties.

12

"Charter schools shall be entitled to full and fair funding . . . ." (§ 47615, subd. (a)(3).) Section 47630 provides, with exceptions not relevant here, "[i]t is the intent of the Legislature that each charter school be provided with operational funding that is equal to the total funding that would be available to a similar school district serving a similar pupil population . . . ." "Charter schools receive state funding primarily based on the number and type of students they serve." (*California Charter Schools Assn. v. Los Angeles Unified School Dist.* (2015) 60 Cal.4th 1221, 1228, citing § 47633.) "The Superintendent shall annually compute a general-purpose entitlement, funded from a combination of state aid and local funds, for each charter school" in the manner specified. (§ 47633.) ADA is a core component of these computations. (§ 47633, subds. (a), (b).) Section 47632 contains definitions relevant to the chapter addressing funding of charter schools. That section defines "[g]eneral-purpose entitlement" as "an amount computed by the local control funding formula pursuant to Section 42238.02, as implemented by Section 42238.03" (§ 47632, subd. (a)), and defines "[g]eneral-purpose funding" as "those funds that consist of state aid, local property taxes, and other revenues applied toward a school district's local control funding formula, pursuant to Section 42238.02, as implemented by Section 42238.03" (§ 47632, subd. (c)). The amount computed pursuant to section 42238.02 "shall be known as the school district and charter school local control funding formula." (§ 42238.02, subd. (a).) Section 42238.02, and other sections employ ADA in funding formulations. (§§ 42238.02, 42238.03, 42238.05, 47633.)

Plaintiffs are correct that, "[i]n California law, a legislative intent to grant contractual rights can be implied from a statute if it contains an unambiguous element of exchange of consideration by a private party for consideration offered by the state." (*California Teachers Assn. v. Cory* (1984) 155 Cal.App.3d 494, 505 (*Cory*).) However, " ' "the principal function of a legislature is not to make contracts, but to make laws that establish the policy of the [governmental body]. [Citation.] Policies, unlike contracts, are inherently subject to revision and repeal." ' " (*Cal Fire Local 2881, supra*, 6 Cal.5th

13

at pp. 977-978, quoting *Retired Employees Assn. of Orange County, Inc. v. County of Orange* (2011) 52 Cal.4th 1171, 1185 (*Retired Employees*).)

"A court charged with deciding whether private contractual rights should be implied from legislation . . . should 'proceed cautiously both in identifying a contract within the language of a . . . statute and in defining the contours of any contractual obligation.' " (*Retired Employees, supra*, 52 Cal.4th at p. 1188.) Courts must presume " ' "that a statutory scheme is not intended to create private contractual or vested rights" ' [citation] and to impose ' "the burden of overcoming that presumption" ' on the party asserting the creation of an implied contractual right." (*Rose v. County of San Benito* (2022) 77 Cal.App.5th 688, 723, quoting *Retired Employees*, at p. 1186.) "[L]egislation in California may be said to create contractual rights when the statutory language or circumstances accompanying its passage 'clearly " . . . evince a legislative intent to create private rights of a contractual nature enforceable against the [governmental body]." ' " (*Retired Employees*, at p. 1187.) "The requirement of a 'clear showing' that legislation was intended to create the asserted contractual obligation [citation] should ensure that neither the governing body nor the public will be blindsided by unexpected obligations." (*Id.* at pp. 1188-1189.)

The statutes contain no express provisions indicating they are to be deemed contractual obligations. However, such express statements are not an indispensable requisite. (*Cal Fire Local 2881, supra*, 6 Cal.5th at p. 980 ["Although the intent to make a contract must be clear, our case law does not inexorably require that the intent be express. [Citation.] A contractual right can be implied from legislation in appropriate circumstances"], quoting *Retired Employees, supra*, 52 Cal.4th at p. 1187.)

Plaintiffs assert that, under the contracts as they interpret them, in exchange for their promises to provide education services to the State, "charter schools are entitled to funding according to the number of students they have enrolled and are required to serve on a tuition-free basis." However, they fail to identify any statutory provision which

14

states, or from which we may infer, that the specific funding methodology became an enforceable term of a contract between the charter operators and the state.

It is impossible to ignore the fact that, historically, statutorily, school funding, including charter school funding, has been based on ADA. The Senate Bills were pandemic-enacted measures that, for one year, changed how ADA was employed. The Senate Bills did not discard ADA as a component in the calculation of funding. But they did fix ADA numbers at prior-year levels and, later, at prior-year levels with projected growth factored in (except as to NCB charter schools). In any event, the plaintiffs have failed to make the requisite "clear showing" to persuade us that the historical means of calculating ADA as expressed in statute became a contractual term of any agreement between the parties. (*Retired Employees, supra*, 52 Cal.4th at pp. 1188-1189.)

Plaintiffs rely on *Cory, supra*, 155 Cal.App.3d 494, in which this court *did* find in statute an implied legislative intent to grant private rights of contract, specifically with regard to teacher pensions. At the outset, the court in *Cory* noted: "The subject of the legislation, pension rights, has long been characterized as within the domain of contract." (*Id*. at p. 505.) The court went on to determine: "A statute offering pension rights in return for employee services expresses an element of exchange and thereby implies these rights will be private rights in the nature of contract. 'A public employee's pension constitutes an element of compensation, and a vested contractual right to pension benefits accrues upon acceptance of employment.' [Citation.] Pension rights can encompass the funding mechanism for the pension when there is a palpable element of exchange involving funding; continued service as a teacher in return for enhanced assurance that funds to pay the pension benefits will be available at retirement." (*Id*. at p. 506.) The court found that the relevant statutory provisions "manifest[] a continuing obligation to fund the Teachers' Retirement Fund in future years pursuant to statutory formulae." (*Ibid*.) The "palpable element of exchange"—pension funding in exchange for work

15

performed—"results in a contractual 'promise', i.e., an intent to confer private rights." (*Ibid*.)

The court in *Cory* rejected the Controller's argument that any contract right was "only a right to systematic, substantial, annual state contributions to the Teachers' Retirement Fund," and that "no impairment of contract occurred when in lieu appropriations of 'substantial' amounts were made by the Legislature in the State Budget Acts of 1980, 1981 and 1982." (*Cory, supra*, 155 Cal.App.3d at p. 508, fn. omitted.) The *Cory* court stated that the contract "contains a straight-out promise to pay fixed and determinable sums of money." (*Ibid*.) Here, plaintiffs rely not on provisions setting forth requirements that the State pay "fixed and determinable sums of money," but to the generalized intent to fund charter schools commensurate with attendance.

Also in *Cory*, the court specified that "the unambiguous inference there is no retained power to modify the amounts due in future installments arises from two considerations." (*Cory, supra*, 155 Cal.App.3d at p. 509.) "The first is that the future installments are provided for in a present appropriation in [former] sections 23401 et seq. which is coupled with the simultaneous repeal of the statute subjecting installments to the annual budgetary process." (*Ibid*.) "Second, where the state makes a contractual offer of a reserve funding scheme for a pension plan the consideration being tendered is a measure of fiscal insurance against future adverse economic and political developments." (*Ibid*., fn. omitted.)

Neither of these two considerations, or analogous ones, give rise to an "unambiguous inference" here that the Legislature lacked the power to modify charter school funding formulations. (*Cory, supra*, 155 Cal.App.3d at p. 509.) Plaintiffs have not identified a specific statutory requirement that charter school funding must always be furnished commensurate with ADA without modification. Nor have they established that there was anything analogous to the repeal of a statute subjecting funding to the annual budgetary process that would give rise to an "unambiguous inference" the Legislature

16

could not modify the method of funding charter schools. (*Ibid.*) Finally, they have not identified a specific contractual offer tendered by the State that we would find to be analogous to "a contractual offer of a reserve funding scheme for a pension plan . . . ." (*Ibid.*) In short, the considerations giving rise to the "unambiguous inference" in *Cory* that the State did not retain power to make modifications going forward are absent here.

Nor, for that matter, would we say that the subject of the legislation—charter schools and their funding—"has long been characterized as within the domain of contract" as the court stated in reference to teacher pension funding in *Cory*. (*Cory, supra*, 155 Cal.App.3d at p. 505.) The brief references to contract in dicta in *Knapp, supra*, 146 Cal.App.4th at page 714, and *Today's Fresh Start, supra*, 57 Cal.4th at page 207, do not establish that school charters have "long been characterized as within the domain of contract." (*Cory*, at p. 505.)

Plaintiffs also rely on *County of San Luis Obispo v. Gage* (1903) 139 Cal. 398. *Gage* addressed a statute that appropriated sums for institutions that supported and maintained children with one or no parents caring for them. (*Id.* at p. 400.) The California Supreme Court in *Gage* concluded: "[I]t must be conceded upon principle that the obligation here in controversy is an obligation arising upon a contract. The state by the act of 1880, in effect promised to each county in the state that if it should thereafter maintain and support persons of a class mentioned in the act, the state would appropriate and pay to such county the sums of money therein stated. This was the equivalent of an offer upon condition, and upon the performance of the condition by any county the offer became a promise, and binding as such upon the state." (*Id.* at pp. 407-408.)

*Gage* addressed the creation of a contract with the State. For purposes of our analysis, we have assumed contracts existed between plaintiffs and the State. Nowhere in *Gage* do we find support for plaintiffs' argument that the specific term they insist is implied—funding based on ADA—was an implied term of their contracts. Again, plaintiffs have failed to make the "clear showing" necessary to demonstrate that the

17

particular method or formulation for that funding established by the Legislature was a term of any contracts between plaintiffs and the State. (*Retired Employees, supra*, 52 Cal.4th at pp. 1188-1189.) *Gage* does not undermine our conclusion.

Plaintiffs also point to the legislative history of the CSA. As emphasized by plaintiffs, the Senate Committee on Education Staff Analysis of Senate Bill No. 1448 (1991-1992 Reg. Sess.), as amended March 26, 1992, stated that the bill would authorize charter schools "to receive state funding in the amount equal to the average unified revenue limit for unified districts *for each pupil enrolled in the charter school*." (Italics added.) A subsequent version of the Staff Analysis, amended August 22, 1992, stated the bill would require the SPI, or Superintendent of Public Instruction, to "apportion funding *for each unit of average daily attendance in the charter school* in an amount equal to the base revenue limit for the school district." (Italics added.) We cannot conclude, based only on this language from the Senate Committee on Education Staff Analysis of the CSA, that the Legislature intended to create a contractual obligation for the formulation of funding for charter schools or that the Legislature would be prevented from altering that formulation going forward. (See *Claypool v. Wilson* (1992) 4 Cal.App.4th 646, 670 ["implication of suspension of legislative control must be 'unmistakable' "].)

Plaintiffs acknowledge the Legislature has the authority to change the way it funds charter schools, for example, on a basis other than ADA. However, plaintiffs assert that the Legislature may not do so in reference to an ongoing charter, stating the State cannot "unilaterally abandon the fundamental bargain on the basis of which *existing* charter schools had agreed to enter into a contractual agreement with the State." Again, plaintiffs have not established that a particular funding formulation or methodology, as opposed to a promise of funding generally, was a term of any contractual agreement between the State and any charter entity.

Moreover, as one court stated in another context: "From how charter schools come into being, to who attends and who can teach, to how they are governed and

18

structured, to funding, accountability and evaluation—the Legislature has plotted all aspects of their existence. Having created the charter school approach, the Legislature can refine it and expand, reduce or abolish charter schools altogether." (*Wilson v. State Board of Education* (1999) 75 Cal.App.4th 1125, 1135.) We are not suggesting that the Legislature can simply pull funding for charter schools altogether and still require them to educate students pursuant to their charter. As discussed above, the law requires that charter schools be entitled to full and fair funding, and that their operational funding be equal to the total funding available to a similar school district serving a similar population. (§§ 47615, subd. (a)(3), 47630.) In this regard, defendants assert that, even if there were a contractual agreement for charter school funding based on statute, "if the alleged bargain in the charter school context is to fund charter schools the same way as non-charter schools, the statutes at issue do exactly that."

We conclude plaintiffs have not identified anything to establish that the funding methodology established by the Legislature constitutes an enforceable contractual promise to the charter school entities or was intended as such. Plaintiffs thus have not overcome the presumption that the statutory scheme was not intended to create private contractual or vested rights (*Retired Employees, supra*, 52 Cal.4th at p. 1186; *Rose v. County of San Benito, supra*, 77 Cal.App.5th at p. 723), and have not met their burden of making a clear showing this legislation was intended to create enforceable contract rights as to charter school funding and funding methodology (*Retired Employees*, at pp. 1188-1189; see also *Cal Fire Local 2881, supra*, 6 Cal.5th at pp. 970-971 ["no indication in the statute conferring the opportunity to purchase [additional retirement service] credit that the Legislature intended to create contractual rights"]).

E.     *Impairment of Contract Rights*

The contract clause of the California Constitution generally prohibits laws impairing the obligation of contracts. (Cal. Const., art I, § 9.) "The contract clause limits the state's power 'to modify its own contracts with other parties, as well as contracts

19

between other parties.' " (*Deputy Sheriffs' Assn. of San Diego County v. County of San Diego* (2015) 233 Cal.App.4th 573, 578.) " 'It has long been settled, however, that the contract clause does not absolutely bar all impairments.' " (*Marquez v. City of Long Beach* (2019) 32 Cal.App.5th 552, 577.) The " 'contract clause protects only vested contractual rights.' " (*Ibid.*)

Where a matter is not a "term and condition . . . protected from impairment by the contract clause, its elimination does not implicate the Constitution." (*Cal Fire Local 2881, supra*, 6 Cal.5th at p. 971.) We have concluded that the specific formulation for funding charter schools was not a term of any contracts, to the extent they existed, between plaintiff charter operators and the State. As such, those matters were not protected by impairment by the contract clause, and the amendment thereof by the Senate Bills did not implicate the contract clause. (*Ibid.*) Nor must we address the parties' contentions concerning whether the Senate Bills constituted a "substantial" impairment of contract rights (see *Alameda County Deputy Sheriff's Association v. Alameda County Employees' Retirement Association* (2020) 9 Cal.5th 1032, 1074-1075), and, even if they did, whether legislative impairment of vested contract rights was warranted because it was reasonable and necessary to serve an important purpose (see *United Firefighters of Los Angeles City v. City of Los Angeles* (1989) 210 Cal.App.3d 1095, 1110; see also *Valdes v. Cory* (1983) 139 Cal.App.3d 773, 790-791).

## II

### *Substantive Due Process*

A.    *Parties' Contentions*

Plaintiffs assert that, because "basic equality" in education is guaranteed under California's Constitution, and protected by substantive due process, these principles obligate defendants to fund the education of every public school student every fiscal year. According to plaintiffs, unlike school districts, they are not government entities but rather nonprofit corporations that are entitled to due process protections. Plaintiffs maintain the

20

Senate Bills violate their substantive due process rights because they "deprive[] them of their property rights – rights to receive funding for each student that vested upon approval to operate charter schools for the State and to enroll students."

Defendants respond that the trial court correctly concluded the laws did not deprive plaintiffs of any constitutionally protected property interest subject to due process protections. According to defendants, "[c]harter schools are deemed school districts for purposes of funding, and it is well-settled that schools do not possess property interests in state funding."

We conclude plaintiffs have failed to demonstrate the existence of a property interest protected under due process or otherwise establish a violation of substantive due process.

B.      *Substantive Due Process Generally*

Under the California Constitution, a person may not be deprived of life, liberty, or property without due process of law. (Cal. Const., art. I, § 7.) "The protection of the due process clause extends to all legal 'persons,' including corporations." (*Gamet v. Blanchard* (2001) 91 Cal.App.4th 1276, 1285; see *Riley v. Stack* (1932) 128 Cal.App. 480, 483 [word "person" in due process clause of federal and California Constitutions "has been extended to include private corporations"]; see also 13 Cal.Jur.3d (2020) Constitutional Law, § 301, pp. 576-577 [same].) "Substantive due process 'prevents government from enacting legislation that is "arbitrary" or "discriminatory" or lacks "a reasonable relation to a proper legislative purpose." ' " (*Chan v. Judicial Council of California* (2011) 199 Cal.App.4th 194, 201.)

" 'To establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government deprivation of life, liberty, or property.' " (*Chan v. Judicial Council of California, supra*, 199 Cal.App.4th at p. 201.) Insofar as relevant here, a party asserting a substantive due process claim must establish a valid property interest within

21

the protection of the Constitution.  (*Clark v. City of Hermosa Beach* (1996) 48 Cal.App.4th 1152, 1184.)

C.      *Existence of Vested Property Interest Protected by Constitution*

"School moneys belong to the state, and the apportionment of funds to a school district does not give that district a proprietary right therein."  (*Butler v. Compton Junior College Dist. of Los Angeles County* (1947) 77 Cal.App.2d 719, 729 (*Butler*); see also § 47612, subd. (c) ["A charter school shall be deemed to be a 'school district' for purposes of Article 1 (commencing with Section 14000) of Chapter 1 of Part 9 of Division 1 of Title 1, Section 41301, Section 41302.5, Article 10 (commencing with Section 41850) of Chapter 5 of Part 24 of Division 3, Section 47638, and Sections 8 and 8.5 of Article XVI of the California Constitution"].)

Plaintiffs emphasize they are nonprofit corporations, not school districts, which are government entities, and, as such, they can have a proprietary right to school funding. Defendants respond that charter schools do not have any property interest in specific state funding because, for purposes of funding, charter schools are deemed to be school districts.

We need not decide whether the plaintiff entities are equivalent to school districts for these purposes.  Assuming they are, they had no proprietary interest in the apportionment of school funds.  (*Butler, supra*, 77 Cal.App.2d at p. 729.)  However, assuming they are not, we nevertheless conclude they had no vested property interest in the funding.

We decided in part I of the Discussion, *ante*, that plaintiffs did not have any contract-based vested interest in the funding.  Beyond their contract-based claims, plaintiffs cite no source or authority for the creation of a vested interest in the apportionment of school funds.  Plaintiffs contend the trial court misconstrued their substantive due process claims as based on their contractual arguments; according to plaintiffs, their substantive due process arguments are in the alternative to their contract-

22

based arguments. Plaintiffs note that charter schools enroll students, obligating the schools to provide an education to the students on a tuition-free basis (§ 47605, subd. (e)(1)), that "[c]harter schools shall be entitled to full and fair funding . . . " (§ 47615, subd. (a)(3)), and that statutes contemplated funding commensurate with ADA/enrollment (§ 47633). Asserting they had a vested interest in school funding, plaintiffs claim "[c]harter schools *had an understanding* that they would be funded for the students they enrolled and served for the State as required under their charters." (Italics added.) This is no more than a restatement, in different form, of plaintiffs' argument that the charters and the statutory scheme gave rise to enforceable contract rights.

Plaintiffs further assert, "if a charter is not a contract, then a charter must be akin to a license or permit that secures rights to benefits that are non-contractual, but nonetheless vested against unlawful government interference." We are unpersuaded.

Plaintiffs cite *Trans-Oceanic Oil Corp. v. Santa Barbara* (1948) 85 Cal.App.2d 776, to support the proposition a "permit or license granted by the government permitting a person to do *something* vests in the recipient a property interest in the benefits of that permit or license – a vested property right – once they have acted on reliance in the permit or license." At the page cited, the court in *Trans-Oceanic Oil Corp.* stated: "If a permittee has acquired a vested property right under a permit, the permit cannot be revoked. The principle is stated in 9 American Jurisprudence, section 8, page 204: 'By the weight of authority, a municipal building permit or license may not arbitrarily be revoked by municipal authorities, particularly where, on the faith of it, the owner has incurred material expense. Such a permit has been declared to be more than a mere license revocable at the will of the licensor. When, in reliance thereon, work upon the building is actually commenced and liabilities are incurred for work and material, the owner acquires a vested property right to the protection of which he is entitled.' " (*Id.* at p. 784.) However, in that case, and the cases on which it relied, the protected interest was

23

the *permit itself* and the ongoing ability to perform work in reliance on it, not payments to be made for work performed under the permit. This line of cases is not authority for the premise that plaintiffs obtained a property interest subject to due process protection in education funding to be paid by the State.

Plaintiffs assert the charters vested in them not only the right to operate charter schools, but also a right to receive funding from the State, and further insist the "charters . . . must thus be treated as *vested property rights* as all of the School Appellants have, in reliance on their charters being approved, acted upon their charters and incurred obligations as described above." However, they cite no authority for the existence of vested property rights other than that as to licenses and permits addressed and rejected *ante*. Plaintiffs' assertions concerning acting on their charters and incurring obligations echoes the circumstances in *Trans-Oceanic Oil Corp.* and the relevant cases discussed therein. (*Trans-Oceanic Oil Corp. v. Santa Barbara, supra*, 85 Cal.App.2d at p. 784.) However, as stated, the property interest protected by due process in those cases were the permits themselves, not money owed for work performed pursuant to those permits.

Plaintiffs have not established any basis for us to conclude that they had a protected due process interest in the payment of funding based on a particular formula or methodology. In this context, we again note, "[h]aving created the charter school approach, the Legislature can refine it and expand, reduce or abolish charter schools altogether." (*Wilson v. State Board of Education, supra*, 75 Cal.App.4th at p. 1135.) We are also of the opinion that "[s]chool moneys belong to the state, and the apportionment of funds to a school district does not give that district a proprietary right therein" (*Butler, supra*, 77 Cal.App.2d at p. 729) not *only* because school districts are agencies of the State (*Department of Finance v. Commission on State Mandates* (2003) 30 Cal.4th 727, 751, fn. 20), but also in light of the Legislature's "plenary" authority over education generally and education funding specifically (*Butt v. State of California, supra*, 4 Cal.4th at p. 688; *Brennon B. v. Superior Court of Contra Costa County* (2020) 57 Cal.App.5th 367, 369,

24

fn. 1; see also *California Schools Bds. Assn. v. State of California* (2011) 192 Cal.App.4th 770, 797 ["determination as to how and whether to spend public funds is within the Legislature's broad discretion"]).  And "a benefit is not a protected entitlement if government officials may grant or deny it in their discretion."  (*Town of Castle Rock Colo. v. Gonzales* (2005) 545 U.S. 748, 756.)  Thus, plaintiffs have not persuaded us the trial court incorrectly concluded they lacked a due process property right to funding as calculated using ADA.

In the absence of a threshold showing of a vested property interest protected by due process, plaintiffs' substantive due process claims fail.  (See *Benn v. County of Los Angeles* (2007) 150 Cal.App.4th 478, 489 ["threshold requirement to a substantive or procedural due process claim is the plaintiff's showing of a liberty or property interest protected by the Constitution" (fn. omitted)].)

D.      *Interference with the Fundamental Right to Education*

Plaintiffs further assert the Senate Bills interfere with the fundamental right to education.  More specifically, according to plaintiffs, students are guaranteed basic equality in education under California's Constitution, the State was therefore required to fund every public school student's education, the Senate Bills interfered with the student plaintiffs' fundamental right to basic equality in education, and therefore the Senate Bills must be reviewed under the strict scrutiny standard.

The trial court rejected this claim, stating, in part, that plaintiffs had "not established that their NCB students actually or effectively have been deprived of an education for any period during the 2020-21 fiscal year.  Consequently, they have not established any violation of a fundamental right that could amount to a substantive due process violation."

We also reject plaintiffs' contention, but on a more fundamental ground:  This claim does not appear in the pleadings.

25

In the amended verified petition and complaint in *Atkins*, the fifth cause of action asserted a violation of the due process clause. In substance, that claim asserted: "Charter school operators have a property interest in their schools' charters and the timely funding that is due to them on account of students in attendance, which may not be taken, destroyed, withheld, diminished, or defunded, without due process of the law," and that the Senate Bills "are unconstitutional because they will result in the taking, destruction, withholding, diminishment, or defunding of cognizable legal interests possessed by John Adams Academy without receiving due process of law." That cause of action is asserted by only plaintiff John James Academy, not the student plaintiffs. This cause of action does not advance the claim asserted by plaintiffs here.

Likewise, the fourth cause of action asserts the Senate Bills are invalid based on, among other things, the due process clause. It too does not assert the Senate Bills interfered with students' fundamental right to equality in education by failing to fund the schools as allegedly required.

Elsewhere, the petition/complaint asserts the Senate Bills violate "due process rights of the non-profit corporations operating charter schools . . . ," not referring to any fundamental due process rights students have to education or equality in education. The petition/complaint does assert generally that students have a fundamental, constitutional right to basic public education. However, the pleading nowhere asserts that the Senate Bills work a substantive due process violation by depriving the student plaintiffs of their fundamental right to an education.

The petition and complaint in *Reyes* contain substantively identical allegations in the fourth and fifth causes of action. The fourth cause of action was specifically asserted by the school plaintiffs and the class. But the class as defined in *Reyes* consisted of NCB charter schools, not students.

Nothing in the pleadings advances the claim raised here, that the Senate Bills violated the *student plaintiffs'* substantive due process rights by interfering with their

26

fundamental rights to education and to equality in education. " 'The complaint delimits the legal theories a plaintiff may pursue and the nature of the evidence which is admissible.' " (*Carlsen v. Koivumaki* (2014) 227 Cal.App.4th 879, 898, quoting *Electronic Funds Solutions, LLC v. Murphy* (2005) 134 Cal.App.4th 1161, 1182.)

In their reply brief, plaintiffs assert their claim is not unpled and that "their *substantive due process* claim should be analyzed under strict scrutiny because the [Senate Bills] interfere[] with educational rights . . . ." (Underlining and boldface omitted.) We do not agree. Plaintiffs' position here is not a manner of analyzing the substantive claim appearing in their pleading. It alleges a different victim: students rather than schools. It also alleges a different injury: interference with the fundamental right to education and to equality in education as opposed to deprivation of a vested property right. In other words, in the absence of a vested property interest protected by due process, plaintiffs seek to vindicate the *schools'* interest in funding by arguing the unpled issue of interference with the *students'* fundamental right to education. The claims plaintiffs advance based on interference with students' fundamental rights are simply not the claims set forth in their pleadings.

E.    *Retrospective Laws*

Lastly, plaintiffs assert the Senate Bills are unconstitutional retrospective laws in violation of due process. "In California a statute is not invalid merely because it is intended to operate retrospectively. It may, however, be invalid if it deprives one of vested rights which are bound to be respected or protected by the state, or if it impairs the obligations of a contract." (*Kenney v. Wolff* (1951) 102 Cal.App.2d 132, 139; accord, *Fullerton Union High School Dist. v. Riles* (1983) 139 Cal.App.3d 369, 386 ["Although retrospective statutes are not per se invalid, if the law deprives a party of a vested or substantive right it will not be upheld"].)

Senate Bill 98 was signed by the Governor on June 29, 2020, filed with the Secretary of State the same day, and became effective immediately. (Stats. 2020, ch. 24,

27

§ 124.)  It was operative only for the 2020-2021 fiscal year.  "The California fiscal year begins on July 1 and ends the following June 30."  (*AvalonBay Communities, Inc. v. County of Los Angeles* (2011) 197 Cal.App.4th 890, 893, fn. 2.)  Insofar as relevant here, Senate Bill 98 fixed funding for the 2020-2021 fiscal year at 2019-2020 fiscal year levels.  In other words, prior to the 2020-2021 fiscal year, Senate Bill 98 set educational funding for that fiscal year.  It operated prospectively.

Plaintiffs assert the law operated retroactively "by precluding charter schools from claiming funding for students they had already enrolled in reliance on the State's preexisting funding obligations."  We disagree.  "A statute is retroactive if it substantially changes the legal effect of past events.  [Citations.]  A statute does not operate retroactively merely because some of the facts or conditions upon which its application depends came into existence prior to its enactment."  (*Kizer v. Hanna* (1989) 48 Cal.3d 1, 7.)  Senate Bill 98 by its terms operated prospectively, fixing funding for the forthcoming fiscal year.  That schools may have enrolled students for the forthcoming fiscal year does not establish that Senate Bill 98 operated retroactively.  Moreover, as stated, plaintiffs have not established the existence of vested rights of which they were deprived by operation of the Senate Bills or that the Senate Bills impaired any contractual obligations.  (See *Fullerton Union High School Dist. v. Riles, supra*, 139 Cal.App.3d at p. 386; *Kenney v. Wolff, supra*, 102 Cal.App.2d at p. 139.)

Senate Bill 820 was signed by the Governor on September 18, 2020, filed with the Secretary of State the same day, and became effective immediately.  (Stats. 2020, ch. 110, § 80.)  Insofar as relevant here, Senate Bill 820 amended former section 43505 to provide that a continuing local educational agency shall be eligible for apportionment reflecting growth from 2019-2020 levels to projected 2020-2021 levels.  (Former § 43505, subd. (b)(1)(A).)  This conferred a benefit on schools, other than NCB schools, allowing them to increased funding based on projected growth.  However, NCB schools were not eligible to avail themselves of this benefit.  (Former § 43505, subd. (c)(1)-(2).)

Thus, Senate Bill 820, enacted after the start of the 2020-2021 fiscal year, conferred a benefit on schools other than NCB schools.  Moreover, Senate Bill 820 did not deprive NCB schools of any benefit to which they had been entitled prior to its enactment.

The Senate Bills were not invalid retrospective laws.

## DISPOSITION

The judgment is affirmed.  Defendants shall recover their costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


/s/
HORST, J.*

We concur:


/s/
MAURO, Acting P. J.


/s/
DUARTE, J.

---

\* Judge of the Placer County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.